(No. 44359.‑

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. WILLIE SCOTT, Appellant.

*Opinion filed October 2, 1972.*

GERALD W. GETTY, Public Defender, of Chicago (JAMES N. GRAMENOS, Assistant Public Defender, of counsel), for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and ELMER C. KISSANE and JAMES N. KARAHALIOS, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE WARD delivered the opinion of the court:

After a jury trial in the circuit court of Cook County, the defendant, Willie Scott, was found guilty of murder and was sentenced to a term of 25 to 40 years. The appellate court affirmed the conviction (132 Ill.App.2d 822, 270 N.E.2d 87)(abstract opinion), and we granted leave to appeal.

The record shows that the presentation of evidence began with the testimony of Iver Johnson, a Chicago police officer, that shortly before 3:00 P.M. on August 11, 1967, he had received a radio message that there was an injured man at 5912 South State Street in Chicago. There the officer found Erskine Jones, Jr., lying on the sidewalk. He had been stabbed in the chest. He attempted to question Jones, after which Jones lapsed into unconsciousness and died within an hour without recovering consciousness.

The defendant's father-in-law, I. D. Johnson, who resided at 5936 South State Street, testified that the defendant had come to his home at about 2:00 P.M. on August 11, 1967, inquiring for Evonia Scott, who was the defendant's wife and the daughter of Johnson. The witness said he had told the defendant that Evonia, who had been separated from the defendant and living with her parents for about a month, was not at home. He testified, also, that at about 2:45 P.M. on the same day, Erskine Jones, the decedent, had come to his home looking for Evonia. When told that Evonia was not at home he had left. Johnson said he observed Jones walk north toward 59th

Street and a few minutes later he saw the defendant, who had been standing across the street on State Street when Jones had come to the Johnson home, walk north on State Street and on the same side of the street as Jones.

The testimony of Gussie Johnson, the wife of I. D. Johnson and the mother of Evonia, was substantially the same as her husband's. In addition, she said that the defendant had telephoned their home at 3:30 and at 5:15 P.M. on August 11, 1967, and had asked to speak with Evonia. At the latter call Mrs. Johnson told him that her daughter would be home at 6:30.

Before 6:30 that evening, both Johnsons testified, two Chicago police officers came to their home while making a house-to-house inquiry regarding the murder victim. They were there at 6:30 when the defendant again phoned. Mrs. Johnson answered the phone and handed it to her daughter, who told one of the officers to listen on an extension.

Evonia Scott testified that following this telephone conversation, she and the two officers went to the defendant's residence at 5727 S. Calumet Avenue in Chicago. On arriving, she observed the defendant standing between two buildings, looking out from the corner of one of them. She noticed that other police officers had also come. When the defendant observed her and the two officers, she said, he ran toward them and "threw away a large, single blade, yellow-handled knife." At trial she identified one of the People's exhibits as the knife.

Detective Joseph Wasilewski of the Chicago Police Department testified that he and his partner, Dale Buehler, had spoken to Mr. and Mrs. Johnson during their investigation of the Jones stabbing. They were, he said, at the Johnson residence when Mrs. Scott received a call from the defendant, and after the telephone conversation, the officers accompanied Mrs. Scott to the defendant's home on Calumet Avenue. While they were enroute they stopped and detective Buehler phoned and requested that another

team of detectives meet them at 57th and South Park, which was near the defendant's home. They met Officers Pendelton and Carroll, and after these officers were shown a photograph of the defendant, which had been furnished by Mrs. Johnson, Pendelton and Carroll prepared to go to the entrance of the building at 5727 South Calumet. Wasilewski testified that he and Buehler then proceeded with Mrs. Scott to the rear of the building. As they entered the backyard they observed the defendant running toward them and away from the front of the building. As he ran he threw "an object in the direction of the garage." Wasilewski and Carroll placed the defendant under arrest, and he was searched by detectives Carroll and Pendleton, who had followed the defendant when he ran from the front to the rear of the building.

The witness said that the defendant was at once taken by Buehler and him to a police station. Detectives Carroll and Pendleton also drove to the station and there Wasilewski said Carroll placed a yellow-handled knife on a table. The witness identified the People's exhibit as the knife.

Officer Patrick Carroll testified that Detective Pendleton and he were ordered by their commander to meet officers Wasilewski and Buehler at 57th and South Park. There, after they were shown a picture of the defendant, they proceeded to the front of the building at 5727 South Calumet. As they approached, they observed a man resembling the defendant standing on the front sidewalk. When the officers got out of their car, the man began to walk from them. When one of the officers called to him, "Hold it, we are police officers," the man began to run and as he ran he took an object from his right pocket and threw it away. Officer Carroll testified that he picked up the object, a yellow-handled knife, as soon as the defendant was arrested. He identified the exhibit as the knife thrown by the defendant. Officers Wasilewski and Carroll testified also to a statement made by the defendant in the police station, which we shall discuss later.

Another witness for the prosecution was Mrs. Hilda Boyd, an acquaintance of the defendant and his wife. She testified that about 4:30 or 5:00 on the afternoon of August 11, 1967, the defendant came to her apartment at 6020 South Wabash Avenue and asked whether she had seen his wife. When she answered that she had not, he said, according to her testimony: "Well, if you see her, tell her I am going to kill her." The witness said that the defendant added that he thought he had just killed a man at 59th and State streets, who had been going out with his wife. She said he then drew a yellow-handled knife from his pocket, brandished it before her, and said: "That is the knife I stabbed him with." The witness identified the knife which was in evidence.

The only defense presented was the defendant's testimony denying the commission of the crime. He testified that from 2:30 P.M. until his arrest at 6:30 P.M. on the day of the crime he had been in his apartment. He denied having made any telephone calls that day.

The defendant contends here there was error in not admitting into evidence certain utterances by the victim; that it was error to have the jury informed that the defendant had been advised of his right to remain silent; and that irrelevant and prejudicial evidence that his wife had suffered a broken jaw was admitted.

At trial the defendant unsuccessfully argued that a statement of the victim to Officer Johnson that his brother-in-law had been his attacker was admissible as a dying declaration. He contends here, too, that the trial court erred in refusing to admit the statement in evidence as a dying declaration, or, alternatively, as a part of the *res gestae* or as a spontaneous declaration. The appellate court considered and rejected the claim that the requirements for admission as a dying declaration had been met. The court noted that it had not been shown that Jones had a consciousness of impending death, saying: "In the instant

case there is no evidence of the deceased's state of mind at the time he made the alleged statement."

The trial court conducted a hearing on the question of admissibility as a dying declaration. The record shows that Officer Johnson at the inquest had indicated that the decedent had said that he had been stabbed and that his brother-in-law had stabbed him. It was, however, brought out that it was not developed at the inquest that the witness had "interpreted" the victim's mumblings to arrive at "brother-in-law." Summarizing the significant portions of the officer's somewhat extended testimony at the hearing, the witness said that the victim had mumbled in indistinct tones and that his responses were incoherent. He said that he had interpreted that the victim had said "brother-in-law," but he testified he was not certain those were the words that the victim used. He said in another part of his testimony: "I did not clearly understand any part of the statement." Officer Johnson told the court that he made out the mumbling of the victim to be "brother-in-law," but he said he did not know whether this was correct or incorrect. He said that possibly the victim could have said something else. Under the questioning of defense counsel the witness testified that as a result of what had been mumbled he did not go out and "look for anybody," *viz.*, a "brother-in-law." There is nothing in the record to indicate that the victim had a brother-in-law.

We consider that the trial court properly denied the "statement's" admission in evidence as a dying declaration. That a dying declaration is admissible as an exception to the hearsay rule is founded upon the likelihood of its trustworthiness and truthfulness. But a necessary condition to the determination of whether the expression of a dying person satisfies the formal requirements of a dying declaration, such as the person's consciousness of impending death, is a showing that a declaration was intelligibly made and also understood by the witness to it. It must

have been communicated. The testimony cannot be only conjectural. In discussing dying declarations, Wigmore (5 Wigmore on Evidence, sec. 1445, at 245 (3d ed. 1940)) says: "Any adequate method of communication, whether by words or by *signs* or *otherwise,* will suffice, provided the indication is positive and definite, and seems to proceed from an intelligence of its meaning ***."

It was for the trial court to pass on the preliminary conditions necessary to the admissibility of the claimed dying declaration. (*People v. Selkness, 309 Ill. 113, 119;* 5 Wigmore on Evidence, sec. 1451 (3d ed. 1940).) We judge that there was not an adequate communication here of any "declaration" and that the testimony of the witness was indefinite and too conjectural. The trial court, which heard the testimony and observed the witness, appeared to base its denial of admissibility on the ground of the deficiency of communication, as well as on a failure to show that Jones had a consciousness of impending death. There was no error in denying admission as a dying declaration. The defendant did not argue for admission before the trial court on the basis of *"res gestae"* or "spontaneous declaration" and these grounds need not be considered on appeal. We would note, however, that any argument on these alternatives would fail also because of the failure to show as a preliminary condition an adequately definite utterance or declaration.

We do not find substance to the additional contention of the defendant that the holding of the Supreme Court in *Washington v. Texas, 388 U.S. 14, 18 L.Ed.2d 1019, 87 S.Ct. 1920,* required admission under the fourteenth amendment. In *Washington* the court held unconstitutional State statutes which provided that persons charged or convicted as co-participants in the same crime could not testify for one another, although there was no statutory bar to giving testimony for the prosecution. The defendant says that this means that the State cannot deprive an accused of the right to present a defense and that the

refusal here to allow the defendant to introduce the hearsay statements of Jones was a type of violation prohibited by *Washington.*

It is evident that the situations here and in *Washington* are far apart. As we have discussed, here there was no real statement of Jones, hearsay or otherwise. Too, there is no suggestion in *Washington* that the admission of otherwise inadmissible hearsay is constitutionally required.

Another contention is that it was error to permit two police officers to testify that the defendant had been informed under *Miranda v. Arizona, 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602,* of his right to remain silent. It is said that this in some manner constituted an improper comment on the fifth amendment rights of the defendant. Officer Wasilewski was asked by the assistant State's Attorney whether he had any conversation with the defendant as the officers drove him to the police station. He answered that he had advised the defendant of his rights, reading from a card used for that purpose. The rights set out on the card were those required under *Miranda* to be given an accused. There was no objection to this testimony. After so testifying, Officer Wasilewski was asked whether the defendant has said anything at the police station. He replied: "I was preparing the arrest slip, that is, I was typing it out on the typewriter, and the defendant screamed, 'She was cheating on me, she shouldn't have brought the police, I have a right to protect myself ***.' "

Officer Carroll also testified that the defendant had made statements testified to by Wasilewski, and, seemingly mistakenly, added that the defendant had made the statements while Wasilewski was advising the defendant of his rights. There was no objection made during this testimony.

It is, of course, the rule that a failure to object to the admission of evidence operates as a waiver of the objection and precludes consideration of the question on appeal.

(*People v. Williams, 28 Ill.2d 114, 115.*) Even had there not been a waiver, we would not consider there had been error. The defendant was informed of his right to be silent and, simply, he chose to speak. In rejecting a contention similar to the one the defendant makes, the court in *United States v. Schennault (7th cir. 1970), 429 F.2d 852, 855,* said: "[W]e cannot say that it was error to inform the jury of the fact that before defendant made the statements, he had been informed that he was under no compulsion to say anything."

The last contention of error is that the defendant was prejudiced by irrelevant and harmful testimony which implied that he had beaten his wife. The record shows that the following questions and answers were asked during the prosecution's direct examination of Gussie Johnson, the mother of Evonia Scott, the defendant's wife:

"PROSECUTOR: What was Evonia's condition of health at the time she was staying at your home?
WITNESS: She was sick at that time.
PROSECUTOR: What was wrong with her?
WITNESS: Her jaw was broken.
PROSECUTOR: And do you know by whom?
DEFENSE COUNSEL: Object to this.
PROSECUTOR: I fail to—
COURT: (Interposing) If she knows, she may tell us. Your objection is overruled.
WITNESS: Yes.
PROSECUTOR: Who?
DEFENSE COUNSEL: (Interposing) Objection.
COURT: The objection is sustained.
PROSECUTOR: Of your own independent knowledge, do you know by whom?
WITNESS: Yes.
PROSECUTOR: I mean without having been told by anyone, did you know?
WITNESS: No, not after having been told by anyone, I don't know."

There was testimony by Isaac Johnson in response to the prosecutor's question that on the day of the murder his daughter "had a wired mouth, broken jaw, or some-

thing." There was no objection to this testimony. Evonia Scott was also allowed to testify that on August 11, 1967, the date of the murder, she had a broken jaw. Before she testified, the defendant, out of the jury's presence, objected on the ground of irrelevancy to the assistant State's Attorney's propounding questions about the condition of the witness. He argued, too, that such testimony would be highly prejudicial, since its effect would be to depict the defendant as a wife beater in the jurors' minds. The trial court ruled that the assistant State's Attorney could inquire as to the wife's state of health as of the time, but that should she testify that she had been injured, the court would not permit questioning as to the cause of the injury. Accordingly, over renewed objection by defense counsel, the wife told of her broken jaw.

The appellate court rejected this claim of error, reasoning: "As to the testimony of the broken jaw, no connection was made or attempted, either during the examination of the witness who testified to Mrs. Scott's jaw or during closing argument, suggesting that it was defendant who broke his wife's jaw or that he was in any manner a 'wife beater' as defendant contends."

We, however, consider that the described testimony constituted error. No argument was made by the prosecution that evidence that the defendant had struck his wife because of a relationship with the decedent should have been admitted to show motive for murder. Under the circumstances the health of Evonia Scott, and, specifically the condition of her jaw, was not relevant to the trial's issue, *viz.*, whether the defendant had murdered Jones. To aggravate, there also was testimony that the defendant and his wife were separated, and it was obvious that there had been difficulties between them. Gussie Johnson, as has been noted, testified that she knew the identity of the person who had broken her daughter's jaw, suggesting that the injury resulted from an assault, rather than from an accident. The dullest of jurors would conclude from all of this that the defendant had caused the injury. It was error

to allow the prosecutor to bring out the suggestive testimony. See *People v. Jackymiak, 381 Ill. 528, 535.*

The guilt of the defendant here, however, was shown by completely persuading evidence. It would be unnecessarily repetitive to restate the evidence which has been described above. Considering the error committed and what we judge to be the overwhelming evidence of guilt we are convinced that the error was harmless.

The judgment of the appellate court is affirmed.

*Judgment affirmed.*