THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
CHARLES CALAHAN, Defendant-Appellant.

First District (2nd Division)   No. 61958

Opinion filed October 12, 1976.

James J. Doherty, Public Defender, of Chicago (Marc Fogelberg and Daniel E. Radakovich, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Michael J. Angarola, and Bertina E. Lampkin, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

Defendant, Charles Calahan, was charged by indictment with the offense of murder in violation of section 9—1 of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, par. 9—1). Upon a jury trial defendant was found to be guilty as charged and was sentenced to a term of confinement of 75-100 years in the Illinois State Penitentiary. From entry of the judgment of conviction defendant appeals contending (1) that the trial court erred in denying defendant's motion *in limine* to exclude from evidence testimony characterized as a dying declaration; (2) that the prosecutor's comments during closing argument deprived defendant of a fair trial; and (3) that the evidence adduced at trial failed to establish his guilt beyond a reasonable doubt.

We affirm the judgment of the circuit court.

Roderick McDuffey and Larry Phipps testified that on the evening of January 14, 1973, they and their friend Joseph Cooper were at the home of Betty McNulty, located at 15 North Oakley Avenue in Chicago, Illinois. At approximately 10:30 p.m. they left the apartment, went to a nearby tavern and purchased a six-pack of beer which the trio shared at Betty McNulty's home. Shortly thereafter, McNulty left their company while

they remained at her residence to attend to her children. She returned at approximately 3 a.m., and McDuffey, Cooper and Phipps then walked two blocks to Joe's Hello Tavern in order to purchase some soft drinks.

Joe Cooper entered the tavern while his two companions remained on the sidewalk. Cooper wore a long black leather coat on this occasion. According to McDuffey and Phipps, defendant, Charles Calahan, emerged from the tavern and asked them if they had a match. They responded in the negative. Defendant then inquired whether they knew the individual in the tavern wearing the long black coat. McDuffey and Phipps identified him as Joe Cooper. Defendant, wearing a black "Superfly" hat and a three-quarter length brown or black leather coat, pulled a gun from his belt, put it in his coat pocket and walked away.

Shortly thereafter, Cooper exited the tavern bearing the soft drinks and the three youths walked away. Defendant reappeared, ordered them to stop and asked Cooper for a match. Cooper attempted to comply. Defendant seized this opportunity to draw his firearm, announced his name and stated that "I'm going to give you three seconds to get that coat off" or "I want your coat. I'm going to count to three." Cooper again attempted to comply and commenced to remove his coat. Defendant counted to two and shot him in the stomach. Cooper dropped the coat and fled. McDuffey testified that defendant picked up the coat and walked away. Phipps testified that he told defendant that he did not have to shoot Cooper inasmuch as Cooper was "coming out of the coat." Defendant turned toward Phipps and said, "What do you want?" Phipps ran and shortly caught up with Cooper.

Cooper returned to the McNulty home and from there was transported to Cook County hospital by Phipps and Betty McNulty's boyfriend. McDuffey remained at the McNulty residence. At the hospital, Phipps described the assailant to investigating authorities. Phipps failed to inform police of defendant's name at that time though at trial his testimony indicated that Calahan announced his name prior to shooting Cooper.

While Cooper was being prepared for emergency surgery, he was visited by his mother, Katie Cooper, and his great aunt, Martha Emery, who each testified during the course of the hearing on defendant's motion *in limine* and subsequently at trial regarding Cooper's dying declaration.

Within hours of the shooting, Chicago Police Officers William Rooney and Daniel Coffman interviewed Booker Strothers, a bartender at Joe's Hello Tavern, who had been on duty that evening. Strothers testified that a man matching the description of defendant, wearing a black "Superfly" hat and brown leather coat had been in the tavern that evening and had left between 3 and 4 a.m. Strothers told the officers that the individual was known to him as Charles Calahan.

Rooney and Coffman proceeded to the administrative offices of the

Chicago Housing Authority where they obtained defendant's address. Upon arrival at that location the officers effected defendant's arrest and seized a black leather coat and black "Superfly" hat. Mrs. Cooper, McDuffey and Phipps identified the coat as belonging to Joe Cooper. McDuffey and Phipps also identified the hat as the one worn by defendant during the shooting.

Phipps was shown a series of photographs, including defendant's, but failed to make an identification. Later that day, however, both Phipps and McDuffey identified defendant from a lineup as Cooper's assailant.

Defendant testified in his own behalf and admitted his presence in Joe's Hello Tavern on the night of the shooting and that he had worn the apparel described by McDuffey and Phipps, indicating that he left by 1:30 a.m. and was at his home by 2 a.m. where he ate and slept until his arrest several hours later. At the coroner's inquest defendant testified that he had returned home by 1-1:30 a.m. Defendant also testified that he received the black leather coat from an unidentified "sissy" several weeks earlier but that he lent the coat to an unnamed friend prior to the shooting. Defendant's brother testified to an alibi that at the time of the shooting defendant was at home.

■■ Defendant initially contends that the trial court erred in denying defendant's motion *in limine* to exclude testimony regarding Cooper's alleged dying declarations. Defendant argues that such statements were mere hearsay and that the prosecution failed to establish that they were intelligibly uttered by the deceased in the belief that his death was imminent and unavoidable.

The law with respect to dying declarations has been firmly established in Illinois. They are broadly defined as extrajudicial statements of fact by the victim, concerning the cause and circumstances of a homicide. In order that such statements be admissible into evidence, as an exception to the rule against hearsay evidence, it must appear that they are made by the victim under the fixed belief and moral conviction that death is impending and certain to follow almost immediately, without opportunity for repentance and in the absence of all hope of avoidance, when he has despaired of life and looks to death as inevitable and at hand. *People v. Tilley* (1950), 406 Ill. 398, 94 N.E.2d 328.

While the original religious justification for the exception may have lost its conviction over the years, it can scarcely be doubted that powerful psychological pressures are present. At the moment wherein the deceased realizes his own death is imminent there can no longer be any temporal self-serving purpose to be furthered regardless of the speaker's personal religious beliefs. Indeed, given the physiological revulsion peculiar to the moment and common to all men, an express showing of the defendant's theological beliefs is immaterial. See 5 Wigmore on Evidence §1443, at

241-42 (3d ed. 1940); McCormick on Evidence §281 *et seq.* (2d ed. 1972).

■■ In ascertaining the declarant's consciousness of his approaching death recourse must be had to all facts and circumstances attending the party giving the dying declaration at the moment of its utterance. Within this context, the declarant must be sufficiently possessed of his mental faculties as to be able to have accurately perceived, recollected and communicated the circumstances surrounding his imminent death. (*People v. Scott* (1972), 52 Ill. 2d 432, 288 N.E.2d 478.) The trial court, in making its preliminary determination of the challenged statement's admissibility, must be satisfied beyond a reasonable doubt that the declarant believed himself *in extremis* when the statements were made. *People v. Beier* (1963), 29 Ill. 2d 511, 194 N.E.2d 280.

Upon careful examination of the record in the case-at-bar we are satisfied that the common law prerequisites for admission of the challenged statements as dying declarations were satisfied.

The victim, Joseph Cooper, sustained a gunshot wound to the abdomen at close range. He was transported to hospital facilities where he was prepared for emergency surgery. To this end he was given oxygen, various tubes were inserted into his body and his arms were strapped to the table upon which he lay. Several physicians, interns and nurses attended to him. One physician testified that Cooper's blood pressure had dropped to alarmingly low levels and that Cooper had relapsed into shock. Cooper's chances of recovery were characterized as "slim." The doctor expressly noted, however, that Cooper was "amazingly" alert, conscious and articulate, engaging the doctor in conversation as to his condition.

Approximately one-half hour after he had been wounded Cooper was visited in the hospital by his mother and Mrs. Emery who stood at his bedside. Mrs. Cooper testified that she felt her son's forehead and remarked aloud, "He is cold. He is dying." According to Mrs. Emery, Mrs. Cooper then asked her son what was wrong. Cooper moaned and struggled to free himself of the oxygen mask which covered his face. He succeeded and said, "I'm shot. Tell them to put me to sleep. I'm dying." Mrs. Cooper further testified that her son indicated that he was shot by "Charles Calahan" or "Calahan." Mrs. Emery did not recall that her nephew mentioned a first name.

■■ Given the victim's articulation of his status and the inevitability of his death as well as the sobering circumstances surrounding the utterance of such statements it cannot be said that these statements were beyond the purview and rationale of the dying declaration exception to the hearsay rule.

Defendant's contention on appeal that Cooper chose to use his final

moments to indulge in hyperbole are unpersuasive. To suggest that Cooper's statements were intended only to indicate great pain is to speculate well beyond a reasonable inference from the record and deny the plain import of Cooper's words.

Similarly, defendant's assertion that Cooper's words were unintelligible and inadequately communicated is without textual support. During the course of the hearing on defendant's motion *in limine* to exclude the dying declarations from evidence, Mrs. Cooper and Mrs. Emery experienced some difficulty in recalling the pronunciation of the assailant's family name as related by Cooper prior to his death. There is no foundation, however, for the broad assertion that the victim's declarations were so conjectural, ambiguous or misunderstood when uttered as to require their exclusion from evidence. *Cf. People v. Scott.*

During the course of the hearing on the motion *in limine*, Mrs. Cooper testified that the name expressed by her son was "Charles Cunningham" or "Cuttingham" but indicated on cross-examination that her son may have said "Calahan." At the same hearing, Mrs. Emery related that Cooper said, "Calaham shot me." The trial court interjected, "I want to go back for my own notes. You said the victim moved the mask and said that Charles Calahan did it?" Mrs. Emery responded, "Yes." No effort was made by counsel to correct the trial judge.

■■ Defendant now argues that the court prompted the witness and that the court had improperly determined at that juncture that Cooper had identified defendant as his assailant. It is noted, however, that the previous witness, Mrs. Cooper, had already testified that her son had identified his assailant's first name as "Charles." Mrs. Emery, when questioned by the trial court, agreed that Cooper had identified "Charles Calahan." We conclude that the evidence adduced at the hearing was more than adequate to establish that Cooper identified defendant as his assailant.

Defendant was accorded every opportunity at trial to cross-examine Mrs. Cooper and Mrs. Emery as to their ability to recall defendant's specific words. Questions raised as to the credibility of these witnesses and the weight to be given their testimony were matters for the trial court on preliminary examination, the argument of counsel, the determination of the jury and the eventual reconsideration of the trial court on motion for new trial. (*People v. Tilley.*) There is ample support for their respective determinations.

Defendant also argues that certain comments by the prosecution in its rebuttal argument to the jury were improper and prejudicial, citing several instances of alleged misconduct which he asserts mandates reversal of his conviction. At the outset we note that defendant failed to voice an objection at trial to any of the comments which he now so

vigorously protests. However, inasmuch as we find that various remarks of counsel were improper. a brief discussion of the matter is warranted.

Defense counsel in his closing argument attacked the personal integrity of the prosecution and referred to certain witness' testimony in earlier hearings not in evidence at trial. His inference that Mrs. Cooper's, Mrs. Emery's and Strothers' testimony was fabricated by the police and "everyone involved" in the prosecution of the trial was unfounded. The comments of the assistant State's Attorney, in response, that defense counsel's tactics were "shabby" and a "smokescreen" appear in their context as restrained.

The prosecution's argument, however, that Phipps and McDuffey would resort to self-help in dealing with defendant should the jury decide that defendant's case merited acquittal was not based upon evidence adduced at trial and had no bearing upon the question of defendant's guilt or innocence. Comments and arguments of this nature are to be condemned and discouraged, and in an appropriate case may be sufficient to require the reversal and remandment of the cause for a new trial.

■■ However, given the strength of the State's case at bar it cannot be said that the decision of the trier of fact would have been different had all of the remarks complained of remained unsaid. (*People v. Nicholls* (1969), 42 Ill. 2d 91, 245 N.E.2d 771.) The evidence of guilt was overwhelming. Defendant was positively identified by two eyewitnesses. Their opportunity to observe defendant on this occasion at extremely close range is unchallenged, and Strothers' testimony serves to place defendant at the tavern shortly prior to the shooting.

Defendant was arrested at his home within hours of Cooper's death. In defendant's bedroom the arresting officers recovered a long black coat identified as that worn by the victim as he was shot and taken from him thereafter.

■■ Such eyewitness testimony, effectively corroborated by the victim's deathbed identification of his assailant and coupled with the proceeds of the robbery recovered from defendant's home several hours after the shooting, serves to competently establish defendant's guilt of the offense of murder beyond a reasonable doubt. *People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631.

For the foregoing reasons the judgment of the circuit court is affirmed.

Judgment affirmed.

DOWNING and JIGANTI, JJ., concur.