THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHNNY VEAL *et al.*, Defendants-Appellants.

First District (1st Division) No. 58472

Opinion filed March 27, 1978.

940

Theodore M. Becker, of Chicago, for appellants.

J. Samuel Tenenbaum, of Chicago, for appellant George Knights.

Sam Adam, of Chicago, for appellant Johnny Veal.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Linda Ann Miller, Michael E. Shabat, Kevin Sweeney, and Eugene J. Rudnik, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendants Johnny Veal and George Clifford Knights were found guilty by a jury of the July 17, 1970, murders of police officers James Severin and Anthony Rizzato. (Ill. Rev. Stat. 1969, ch. 38, par. 9—1.) Defendants' post-trial motions were denied. Each defendant was sentenced to the Illinois State Penitentiary for a term of not less than 100 years nor more than 199 years for each murder, the sentences to run concurrently.

Defendants appeal, contending that their convictions should be reversed or that they should be granted a new trial because (1) the prosecution suppressed and failed to disclose to the defense the fact that juvenile charges were pending against two key State's witnesses; (2) the prosecution suppressed evidence highly favorable to the defense; (3) defendants were denied their constitutional rights to a trial by a fair and impartial jury and their constitutional due process rights to a fair trial; (4) the trial judge improperly declined to recuse himself from presiding over the hearing on the post-trial motions; (5) the trial court improperly excluded defendant Veal's alibi defense; (6) the assistant State's attorneys made prejudicial and uncalled-for remarks during their closing arguments; (7) defendant Veal was not proved guilty beyond a reasonable doubt; (8) defendant Knights was not proved guilty beyond a reasonable doubt; (9) the trial court improperly inspected documents in camera and released to defense counsel only parts of those documents; and (10) the jury was improperly instructed.

The record discloses:

On July 17, 1970, while on duty as officers assigned to the Chicago Police Department's "Walk and Talk" community relations unit in the Cabrini-Green area, Sergeant James Severin and Patrolman Anthony Rizzato were killed by sniper gunfire. The Cabrini-Green area, is a housing project in Chicago, consisting of several high-rise buildings and row houses of approximately 3600 apartment units, with a population of 17,000 or 18,000 people. The high-rise buildings at 1150-1160 North Sedgwick and 1117-1119 North Cleveland overlook an open area which includes a baseball field. The 1150-1160 North Sedgwick building is north and the 1117-1119 North Cleveland building is west of the baseball field. The windows in the apartments numbered 02 on the south end of the 1150 building are in the bathrooms and face south.

William Dyson testified that he belonged to the Black Deuces, a street gang. Defendant Veal, as did Jake Davis, belonged to the Stones, whose full name is Black P. Stones. Dyson was an enemy of Veal in a sense, *i.e.*,

both he and Veal are black and in that sense not enemies; otherwise, they were. He testified that about 7 p.m. on July 17, 1970, he was in the breezeway of 1119 North Cleveland and saw the police officers as they were shot. They were south of the 1150 North Sedgwick building. Later, at about 8 or 8:30 p.m., he was at the corner of Division and Cleveland Streets with Butch and Scoop Malone. There he saw defendant Veal, who was with Jake Davis. Others were present who were Black Deuces, but he didn't remember their names. Veal said to him, "What's happening? You lucky, I had my scope on you, but you left." "See how the Stones do it, let's see if you all can get three of them." This latter statement was directed to William Dyson's group, the Black Deuces. William Dyson knew what defendant Veal was referring to. Veal didn't say "he" shot the police officers; he said, "we." William Dyson also knew that defendant Veal, when he said, "I had you in my scope," meant that he had Dyson in his gunsights to shoot him.

Roosevelt Moore testified that on July 17, 1970, he was in the parking lot on the east side of 1150 North Sedgwick when the two police officers were shot. He saw them in front of 1117-1119 North Cleveland, walking north toward the high-rise building at 1157 North Cleveland. He heard a blast like a shotgun from the south side of 1150 North Sedgwick, which faced the baseball field. The two officers started east toward the 1150 building. As they reached the side of that building, two shots came from the south side of that building. One officer fell instantly; the other hesitated three or four seconds and then fell. Both were on the south side of the 1150 building. At the time of the shootings he did not see either defendant Knights or Veal, both of whom he knew, although he had seen them in the parking lot during the three or four hours he had been in the parking lot prior to the shootings. There were no adults in the parking lot at the time of the shooting that he could recall.

About 9 or 10 p.m. that evening he saw defendant Knights in front of his (Moore's) apartment at 1157 North Sedgwick. Knights and three others were walking south on the east side of Sedgwick. They were talking and Roosevelt Moore heard Knights say, "I told you I was going to get two of those white mother fuckers."

George Boone testified that in July 1970 he was employed by Wells-Fargo as a security guard and was assigned to operate the closed circuit television monitoring room at 1160 North Sedgwick and to patrol the stairways and halls there. He knew defendants Veal and Knights. At about 6 p.m. on July 17, 1970, he saw defendant Veal with other boys, including Jerry Davis, in the parking lot at 1150 North Sedgwick. Veal asked him if the south side apartments on the 6th floor were empty. He told Veal that about all the apartments up there were vacant. Veal said, "I guess I'll check it out." Boone saw him enter the 1150 North Sedgwick building.

About twenty minutes later he saw Veal on the sidewalk east of the entrance to the 1150 building. Defendant Veal was with defendant Knights. Boone was only one parking space away from defendants, who were talking. Four or five other men were there. Veal was asking the fellows about some .30-.30's. He said, "I need some .30-.30's." Knights did not say anything. Boone last saw the defendants and the others in front of the 1150 building.

Later, while Boone was playing ball on the baseball field at the south end of the building with a boy and Norman Gibson, he heard a loud sound like a firecracker or cherry bomb. The sound came from the 1150 building. Then he heard a shot and saw a gun barrel sticking out of a window of the 1150 building. Everyone on the ball field ran. Boone and his two companions started back toward that building and stopped at the south end of it. After a second shot was fired, it became quiet. Boone looked up at the 1150 building and toward the building at 1117 North Cleveland. He saw a man in the 11th floor breezeway of the 1117 building looking with binoculars at the 1150 North Sedgwick building. He recognized the man as Ronnie Dykes, the leader of a gang. Dykes then went back into the breezeway. Boone also saw six or seven members of the Deuces gang with Dykes. They had rifles and shotguns. Dykes did not have a gun.

Boone then saw several police on the baseball field. After two police officers cut across the ball field, they started to walk toward the 1150 North Sedgwick building. Boone heard a clicking sound from the 1150 building. It was the sound of a weapon. One of the officers approached the building from the baseball diamond. Boone looked up at that building and saw a gun barrel sticking out of a window six floors up. He was still watching the building and the rifle barrel when it went off. Boone saw the officer fall. Boone then went down toward the entrance of 1150. At the time of the shot, neither defendant Veal nor Knights was in Boone's sight.

Police officer Thomas Wilczenski testified that he and his partner, Officer Thomas McNally, after receiving a radio distress call after 7 p.m. on July 17, 1970, went to the ball field near the 1150-1160 North Sedgwick building. They saw two police officers lying on the ground and several police cars behind which police officers were crouching. He assisted in placing one of the fallen police officers into a police car as bullets were striking the field. The shots sounded like they were coming from 1150 North Sedgwick and 1119 North Cleveland. After hearing the shots, he ran to the southeast corner of the 1150 building and looking north along the eastern edge of that building saw defendant Knights, whom he knew, come out of the breezeway of that building. Knights was with seven or eight children. Knights was standing in the midst of the children on a little sidewalk just east of that building.

Police officer Thomas McNally, Wilczenski's partner, testified that while the two officers were lying on the ground and other officers were crouched behind squad cars, dirt was being kicked up by projectiles striking the ground. He directed fire at the south end of 1150 North Sedgwick from approximately the fourth or fifth floor upwards as a cover for the police. He ran to the southeast corner of the 1150 building. He directed his attention to shots from approximately the third floor from the top of the 1117-1119 North Cleveland building. He also directed his attention to the upper floors of 1150 North Sedgwick. He looked along the east side of the latter building and saw defendant Knights, whom he knew, outside of the breezeway with seven or eight youths, four or five of whom were small children. He had heard and observed the shots before seeing Knights coming out. The only other people he saw at or near the parking lot at that time were two police officers.

Police officer Clarence Lewis testified that on July 17, 1970, Officer Anthony Rizzato was his partner and Sergeant Severin was his supervisor in the Police Department's "Walk and Talk" Community Relations Unit. As Lewis and Sergeant Severin were walking from the Security Building at 418 West Oak Street toward the 1150 North Sedgwick building, they met Officer Brauchler and others. Severin pointed to the 4th floor window of the 1150 building which had a white curtain in it and said that shots had been fired from that window; he had received that information from Earl Quinn, who lived at 1117 North Cleveland. After Officer Lewis, Sergeant Severin, Officer Rizzato and one other police officer arrived at the 1119 North Cleveland building, Officer Lewis stopped and saw Officer Rizzato, with Sergeant Severin following, walk east across the ball field. When the two had gone about then feet past the 1150 North Sedgwick building, they stopped and then started to walk back west. Lewis heard two shots. At the first shot, Sergeant Severin fell; at the second, Rizzato. Lewis knew that the shots had not come from the 1117-1119 North Cleveland building. He did not knew where they came from. Squad cars came to pick up the two fallen police officers. Lewis heard more shots and saw the ground erupt where the officers were standing trying to put the two into squad cars.

Police sergeants Edward Stepter and John Sandifer and Police officer Sargus testified that when the bodies of the two police officers were removed from the ball field by squad cars, shots were hitting the ground around the squad cars.

It was stipulated that if Dr. Jerry Kearns, the coroner's pathologist, were called as a witness, he would testify that he performed autopsies on the bodies of the two police officers on July 18, 1970. In his professional opinion, the cause of Officer Rizzato's death was a bullet wound of the heart, the path of which was downward, and the cause of death of

Sergeant Severin was a bullet wound of the liver, the path of which was downward.

Jerry Davis testified that on July 17, 1970, he lived at 1157 North Cleveland. He saw defendant Veal about noon that day in the parking lot at 1150 North Sedgwick. Present with him were Calvin Murdock, Johnny Smith and Jake Davis (Jerry Davis' twin brother). Defendant Veal said, "Go to the 6th floor." Jerry Davis and Calvin Murdock said they didn't want to go. Veal said, "you'd better go." All four went with Veal to Apartment 603, which was vacant. It faced east on Sedgwick Street. Veal looked out the window and said, "Here's where we're going to start to ice the police from" By "ice", he meant "kill." Jerry Davis and Murdock laughed because they didn't believe it. All then came downstairs. Before 6 p.m. that day, while sitting on the steps of 1157 North Sedgwick with Swan Cook and Jean Moore, he again saw Veal.

Later, about 9:45 p.m., while he was sitting on the steps of 1157 North Sedgwick, across from 1150 North Sedgwick, with Swan Cook, Jean Moore, Veraline Simes, he saw defendant Knights and two others walking and drinking a can of beer. Knights stopped and said to him, "I shot the fuck out of those two police." Knights held out his hand and Jerry Davis "gave him five," slapping his hand on top of Knights', who then walked away.

Jerry Davis, his brother Jake, defendant Veal and Daryl Faulkner all belonged to the Cobra Stones. Defendant Veal was an ambassador in the Cobra Stones; an ambassador is almost a chief.

Jake Davis testified that on July 17, 1970, at about 10 a.m., he saw defendant Veal with defendant Knights and a person named George in the breezeway of the 1150 building. Veal was talking to them about some wine. Veal asked Knights, "Are you still going to give me those shells?" and Knights said, "Wait." Veal asked Jake Davis if he had a rifle. Jake said that he had a .22 rifle in his pants, which he had got from Veal. Jake told Veal he was going to take it over to 1157 North Sedgwick and put it behind the wall. Veal said he would come back and get it. Jake put the rifle there and saw Veal get it.

Later that day, Jake, who was with his brother Jerry, Johnny Smith and Calvin Murdock, saw Veal in the parking lot. Veal told them to come and go to the 6th floor with him. Jerry Davis, Johnny Smith and Calvin Murdock said they "ain't set to go." Veal said they had better come. They all went up to Apartment 603 in the 1150 building. Veal looked out the window and said, "This is where we are going to start icing the police." "Ice" means "kill." Jake, Jerry and Murdock started laughing like they didn't believe it. Veal said we got one in 602, here is the key. He had a key at that time.

Later, about two or three hours after 10 a.m., Jake Davis saw Veal in

the parking lot with Knights, Sidney Bennett and Boomie (Vernon Baker). He overheard a conversation in which Knights asked Veal, he said, "We are going to kill the police?" and Veal said, "Yes, the police don't mean nothing to me anyway." Knights then asked Sidney Bennett, who said "Yes, they fired me up." Knights then asked Boomie and he said, "Yes, they locked me up." Right after that, Veal said, I'll be in 602 or 603" and Boomie said, "I'll be thinking about across the street."

Later, Jake Davis, while in the parking lot of the 1150 building, saw Veal coming out of the 1160 building with a guitar case. At an earlier time he had seen Veal with the guitar case open; inside was a .30-.30 Winchester rifle. Veal went to the 1150 building breezeway. After Jake Davis had seen Veal come out of the breezeway at 1160, he saw Knights with Sidney Bennett. They were coming around the part of the 1150 building which was near the ball field. They went into the 1150 building. Jake Davis saw two rifles at that time.

Some time later, Jake Davis went with Boomie and Paul Williams to a vacant apartment at 1157 North Sedgwick, right across the street from the 1150 building. Jake Davis saw the two police officers coming toward the 1117 North Cleveland building. They next walked on the ball field toward the 1150 North Sedgwick building. They reached the front end of the 1150 building, where the bathroom windows were. Jake Davis heard a loud shot; one of the police officers fell; then the other stumbled and fell. He looked out of the window and saw defendant Knights in a window on the 6th floor of the 1150 building. Knights was hanging a rifle out of the window. He also saw Sidney Bennett at a window in Apartment 603. In his statement to the police, Jake Davis said that a little while after the cessation of the shooting, which he had seen Knights doing at the police, he saw Knights and Veal looking out of an apartment window on the 8th floor.

That same evening, about an hour after the police were shot, Jake Davis saw William Dyson at Cleveland and Division Streets. Present were some Stones, some Blacks and defendant Veal. Veal told Dyson that he, Veal, had had Dyson in his scope at 602 and didn't know how he missed him. Dyson asked Veal who shot the police. Veal said, "We did."

A Stone came over and told Veal he had heard over one of the police squad cars a message to pick up Veal for killing the two police officers. Veal said he was going to take a ticket, which meant to leave. Jake Davis asked him where he was going. Veal said on 72nd and told Jake Davis that he (Jake Davis) was the only one who knew where he (Veal) was going and that if Veal was found he would kill Jake Davis. Veal then got on a bike and left.

Robert Curry testified that on July 17, 1970, he was a program coordinator for the National Youth Corps. On that day he saw Sergeant

Severin from approximately 3:30 p.m. to 6:35 p.m. At about the end of that period, he and Sergeant Severin walked in a northerly direction on the ball field. He left Sergeant Severin at the edge of the parking lot of 1150-1160 North Sedgwick and walked across the street to get help to start his car, which was at the corner of Elm and Sedgwick Streets. While he was standing next to his car, four men walked up. One was defendant Veal, whom he knew, one was defendant Knights, whom he had never seen before; he did not know the names of the other two. Robert Curry had organized a baseball game in which Sergeant Severin and other policemen were acting as umpires. Defendant Knights asked Curry why he was having the "pigs" umpire the baseball game. One of the others, not defendant Veal, said that was all right, they would take care of it. Defendant Veal was carrying a guitar case. Defendant Knights was carrying something like an overnight case. The four men walked west on the fire lane between 1150 North Sedgwick and 1117 North Cleveland.

Cedric Langham testified that he was a correctional officer for the Cook County Sheriff and was working in one of the tiers in the Cook County Jail on March 17, 1970. Defendant Veal was in a conversation with eight or nine other inmates. He heard Veal say that when he got out he was going to kill either a couple of well-known gang leaders or a couple of cops; it was just a step to make a reputation.

George Williams, the janitor at the 1150 North Segwick building, testified that a 7 a.m. on July 18, 1970, he was cleaning and burning garbage in the incinerator room for about 50 minutes; that building is 19 stories and has an incinerator drop for the building on the east wall on each floor. The incinerator room, enclosed within a metal fence, is accessible only from the outside of the building. He locked the room and went to clean the lobby. When he returned, he found a live .30-.30 casing on the floor. He took it to the building manager and then returned and burned more garbage. He saw no weapons at that time. He went again to the lobby and returned to the incinerator room between 9 and 10 a.m. When he opened the incinerator, there were two rifles and some garbage lying inside. (One was a .30-.30 Savage and the other a .30-.30 Winchester.) The rifles were not there earlier when he was burning garbage. He could not rightfully say whether the door was locked or unlocked when he saw the rifles. He locked the incinerator room and told the building manager. The police came and retrieved the rifles.

Jake Davis testified that a year or more before the trial he had seen the .30-.30 Savage rifle in the janitor's room at the 1150 building. No one had it at that time. At another time he had seen that rifle with defendant Knights. On July 16 he had seen defendant Veal with the .30-.30 Winchester rifle. On July 11 defendant Veal had had it in a guitar case.

Police officer Orlando Bellini testified that on July 18, 1970, he went

with two other officers to the incinerator room at 1150 North Sedgwick. He found two rifles in the garbage catch at the bottom of the garbage chute. After removing the rifles, he also removed and inspected the garbage and found a paper bag in which was a box containing .30-.30 ammunition and some papers. He did not recall whether he saw any live .30-.30 ammunition in the bag. He also found a telephone, with its cord indicating it had been pulled from a connection. Later, Officer Holt from the Crime Laboratory took the rifles, bag and telephone.

Police officer Earl A. Holt testified that he examined the rifles found in the incinerator room, but found no fingerprints suitable for comparison. He found two fingerprints on the cartridge box which was in the paper bag, one of which was suitable for comparison. There were no fingerprints on the bag. In the bag were two cash register receipts from J. W. Millikan, Hammond, Indiana. There were no fingerprints on them. He also found in the bag two live rounds of .30-.30 shells. They contained no fingerprints. Each rifle had one spent casing in it; there were no fingerprints on the casings. He found fingerprints on the telephone suitable for comparison. He also testified that in Apartment 602 on the bathroom mirror he found two fingerprints and one palm print suitable for comparison.

George Morganthaler testified that he was a clerk at J. W. Millikan's Sporting Goods store in Hammond, Indiana. On July 16, 1970, he sold two boxes of Winchester .30-.30 ammunition to a person who signed the required Federal disposition record "G. C. Knights" and that this signature corresponded with the writing on a driver's license presented by that person. He could not identify the purchaser by his face, but he recalled he showed him a sawed-off shotgun. He attached a gummed label containing the store's name to each of the boxes of ammunition.

David J. Purtell, a Police Department examiner of questioned documents testified that he had compared the name signed on the Federal disposition record at the Millikan Sporting Goods store with known samples of defendant Knights' signature and that in his opinion the name signed on the Federal disposition record was signed by defendant Knights and that the cash register receipts found in the incinerator room were from that store.

Joseph William Mortimer, a fingerprint technician, testified that he compared the fingerprints of defendant Knights with the fingerprint found on the ammunition box found in the incinerator room and that the latter fingerprint was that of defendant Knights. He also examined fingerprint and palm prints found in Apartment 602, but they were not those of defendant Veal or defendant Knights. The same was true as to the fingerprint found on the telephone.

It was stipulated that a representative of the Illinois Bell Telephone

Company, if called as a witness, would testify that the telephone found in the incinerator room came from Apartment 1302 which had been vacated on July 11, 1970.

Nan Harper testified that she was a clerk in the Remirmelli Drug Store, located at 454 West Division Street, about one-half block from 1150 North Sedgwick. The store was owned by Marvin Solomon. She knew defendant Knights as a customer of the store. On July 8, 1970, Knights came into the store and asked to see Marvin Solomon. When he was unable to see him because Solomon was busy, Knights left a shell casing and said, "Tell Marv this is what I have been shooting." After showing the casing to Solomon, she put it in a box. On July 21, 1970, Solomon gave it to Officer Chowath. Later, two detectives brought the casing back and Solomon initialed it. Nan Harper identified the casing in court.

Marvin Solomon testified that he was the owner of the Remermelli Drug Store. On July 8, 1970, about 3 p.m., defendant Knights was in the drug store asking for him, but, because Solomon was busy, Knights left. Shortly thereafter, Nan Harper showed him a shell casing which Knights had left with her. Solomon gave it back to her and told her to throw it away. He later learned that she had not. On July 20, 1970, he saw the casing in the cigar box used to hold miscellaneous objects. He called the police and gave it to Officer Chowath, who later returned with Detectives Roppel and Durkin. Solomon marked the casing with his initial and Roppel and Durkin took it with them. At the trial, Solomon identified the casing.

On July 17, 1970, between 6 and 6:15 p.m., Solomon was inside the store behind a locked gate. He saw defendant Knights outside the store. Knights asked him if he had any .30-.30 shells. When Solomon said he did not, Knights said, "Maybe you would like to buy a .30-.30 Winchester, lever action." Solomon asked Knights if he had more than one rifle to sell. Knights said he had two rifles; the other was also a .30-.30, a Stevens bolt action with a high-powered scope. Solomon told him he would let him know if he wanted to purchase any of the rifles. People in the Cabrini-Green area knew that Solomon purchased guns. On one occasion he had purchased a .410 shotgun from Knights.

About one month before July 8, 1970, Knights had asked Solomon if he had any .30-.30 ammunition. When the latter said he had none and could not get any, Knights said, "I can go to Indiana and get any sized bullet I want" and Solomon told Knights that is what Knights should do.

Earlier, in December of 1969, Knights had asked Solomon if he had any .22 magnum shells. Solomon gave him three or four .22 rifle shells he had. At that time Knights said he had a .22 magnum with a scope and that he was real good with it, that scope is a beauty and that he could hit anything at 600 feet.

Officer Curtis Crisler testified that he had been assigned to the Cabrini-Green area for 12 years. He had known defendant Knights for 5, 6 or 7 years and had had conversations with him, usually in the parking lot in front of 1150-1160 North Sedgwick or in the vicinity of that building. Knights had been a janitor there.

In June or July of 1970 he had seen Knights in a window of the south side of the 1150 building on the 8th floor. Knights had held up something out of the window and hollered, "I've got it. Hey, Cris, I've got it." It looked like a rifle, although Officer Crisler was not sure it was a gun. Knights had said to Officer Crisler some time before July that he was going to buy some type of an army rifle to go deer hunting.

Officer Crisler had known defendant Veal 3 or 4 years. Veal had talked to him in July, before July 17, 1970, about a rifle. Veal had asked him if he knew where he could get a rifle fixed. Veal said it was a lever action rifle which, when it was cocked, wouldn't pick up the shell which had to be put in with the thumb. Veal wouldn't bring the rifle to Officer Crisler because, Veal said, Crisler would take it. Crisler said, "Go see Marvin, maybe he knows."

Police Technician Donald Gunnell testified that he and Officer Brooks, with metal detectors, made a search of the ball field and found bullets, lead fragments and a copper bullet jacket to which fibers were adhering. It was stipulated that if Officer Brooks were called as a witness, his testimony would corroborate that of Police Technician Gunnell. Donald Gunnell also testified that there was one area of blood in the ball field 176 feet southeast of the southern end of the 1150 North Sedgwick building and a second area of blood 36 feet farther south-southeasterly. The copper bullet jacket found was southeast of these two areas of blood.

The shirts worn by the two police officers were examined by Bernadette Kwak, a Police Department microanalyst. She also examined the fibers adhering to the copper bullet jacket found on the ball field. She testified that in her professional opinion the fibers of material which she had taken from Sergeant Severin's shirt and the fibers she had removed from the copper bullet jacket were all blue cotton. It was also her professional opinion that the copper bullet jacket had passed through something, possibly a type of animal which was covered with blue 100% cotton cloth.

Ernest Warner, a firearms examiner, testified that he examined and test-fired the Savage and Winchester rifles found in the incinerator room. In his professional opinion, the copper bullet jacket with fibers adhering to it found on the ball field had been fired from the Savage rifle and that the .30-.30 cartridge left at the drug store owned by Marvin Solomon had also been fired from the Savage rifle. In his test-firing of the Savage rifle he

found it would not feed a second round of ammunition from the magazine into the chamber.

Earline Maten, who lived in Apartment 204 at 1150 North Sedgwick, testified for the defense that on July 17, 1970, about or 5:30 p.m., she was sitting with her children, facing east, on the steps in front of the 1150 building. She heard a shot, stood up, looked south and saw one of the police officers on the ground. She heard a second shot and saw the second officer fall next to the first one on the ball field next to the 1150 building. Defendant Knights was in the east parking lot at the rear of his auto when she heard the first shot, when she looked south and saw the officer on the ground, when she heard the second shot and when she saw the second officer fall. Defendant Knights grabbed her little baby boy Terrell and ran and all of them started up the steps. She met Mrs. Welch in the breezeway coming down after her boy. Earline Maten, her children, defendant Knights, Mrs. Welch and her son all went up the stairway in the 1150 building directly to Mrs. Welch's apartment, No. 207. Shots were coming from the 1117-1119 North Cleveland building. Defendant Knights left Mrs. Welch's apartment after the shooting had died down.

It sounded as if the shots came from the 1117-1119 North Cleveland building. She did not know where they did come from and did not know how many shots she had heard when the second officer fell. The shots could have come from anyplace.

When Knights was in the parking lot, present were the two Gibsons and a James, Jerry and David, whose last names she did not know. She (Earline Maten) was also present, as were her children and Mrs. Welch's child.

Earline Maten did not tell Officer Smith that she saw defendant Knights in the parking lot at the time of the shooting. She also testified that she had not said to Detective Northen that defendant Knights had come to Apartment 207 about five minutes after the shooting and had said, "Everything is all right. Don't worry." She has never seen anything in writing, other than the transcript of her direct testimony, which says anything about defendant Knights being in the parking lot at the time the officers were killed or about him picking up the child and going upstairs.

Mrs. Marsha Jones, who lived in Apartment 1102 at 1150 North Sedgwick, testified for the defense that on July 17, 1970, at about 7 p.m., she was getting her daughter ready for a weekend visit with her grandmother when she heard a shot from the side of the building in the back. She went downstairs with her daughter to meet her former husband in the east parking lot of the 1150 building. When she was in the breezeway, she heard a rifle shot which seemed to come from behind her. She ran out of the breezeway and down the steps. She heard another shot which came from behind the building and when she heard the second

shot she was running out of the building. She saw people running toward the building and looking toward the ball field. She looked and saw one policeman go down and the second go over on his face. While running from the steps to her former husband's car she saw Earline Maten, defendant Knights, Norman Gibson, George Boone and many children. Knights and a man were sitting on a car right in front of the building. After putting her daughter in her former husband's car, she ran back toward the building. Defendant Knights was hollering and carrying a child, trying to get people and children into the building. Knights had Earline Maten's baby in his arms as he went up the first stairwell. The third shot she heard came from the side of the 1150 building behind her; it seemed to come from 1117-1119 North Cleveland. The first shot she had heard while in her apartment sounded like it came from the back side of the 1150 building, the southwest edge. After she came out of the breezeway, she saw defendant Knights and others in the vicinity of the walkway.

Miss Jackie Futrell testified for the defense that on July 17, 1970, at about 7 p.m., she was in Apartment 305 at 1119 North Cleveland. She saw two police officers run out into the ball field. When they got there, they fell. She heard shots and saw sparks from the 17th floor and some more from the 13th floor of the 1150 building.

Geneva Sandifer, who lived in Apartment 607 at 1119 North Cleveland, testified for the defense that on July 17, 1970, she heard a bang and looked out an east bedroom window directly above the baseball field. She saw one policeman starting across the ball field, northeast toward the 1150 building. When he got about to the end of the 1150 building, he waved. Another policeman followed. The first policeman had started back toward the 1119 building and when the two policemen got about 10 feet from each other, she heard a noise again. The first policeman, a sergeant, fell and Geneva Sandifer and her brother saw smoke coming from a window. When the sergeant fell, there was a pipe-like instrument hanging out the window of the 13th floor bathroom of the 1150 building. The second policeman turned around and started firing back at the 1150 building and then he fell. She heard no shooting after he fell until the patrol cars started coming in. After she saw the policemen go down, the sergeant didn't move again; the other policeman did. After a patrol car came, he helped himself in under his own power.

George R. Williams, who had testified for the State, was called by the defense. He stated that on July 17, 1970, at about 3:30 p.m., he drove into the parking lot behind 1160 North Sedgwick. He saw defendant Knights sitting in his car, drinking a pint of wine. The parking lot in which he saw Knights was northwest of the 1150-1160 building. The other parking lot for these buildings is east of the building. He (Williams) can look into the

east parking lot from the bathroom windows in Apartment 405 in the 1150 building where he lives. These windows face east.

After seeing Knights in the west parking lot, Williams went to sleep in his apartment. He heard a shot, opened the window and heard another shot. He looked down into the east parking lot and saw Knights standing there. Mrs. Maten was standing near the fence. Williams called to Knights and asked him what was happening. Knights raised two fingers and said two policemen had just been shot. When Williams saw Knights below, Knights was gathering up some kids.

Because Williams had been asleep, he did not know how long before he woke up the police officers had been shot; nor did he know whether he was asleep when the officers were shot, nor when the officers were shot. When he went to the window, he heard more shooting. In his statement to defendant Knights' attorney, Williams said he heard shots and that he had told the police and one of the assistant State's attorneys that Knights could not possibly have shot the officers because he (Williams) is a very light sleeper and he heard some shots that awakened him and immediately jumped up, looked out the window and saw Knights. Williams is a friend of the Knights family.

Defendant Knights testified that he had been a janitor's helper assigned to the 1150 building. George Williams worked with him. As a janitor's helper, he did not have passkeys. His employment ceased in June or July of 1969. In October of that year he moved from the 1150 building to 862 North Sedgwick. He had a livery service in the 1150 building with George Williams, who would get phone calls and would then call down to Knights and tell him where to go.

Neither on July 8, 1970, nor on any other date did he go into the Remirmelli Drug Store and say to Nan Harper about the shell casing in his hand, "Tell Marv that this is what I shoot."

On July 16, 1970, he saw Boizell Wilson coming south from Division Street on the sidewalk in front of the 1150-1160 building. Knights was sitting in his car in front of the 1150 building. Wilson wanted to go to Hammond, Indiana, and Knights drove him there for $10. In Hammond, Wilson went into a department store, came out and asked Knights to buy some bullets for him because he could not buy them himself. Wilson wanted two boxes of .30-.30's and gave Knights $15. Both went into the store and Knights bought the shells, signing his name and address and his birth date on the Federal registration form. He did not attempt to conceal his handwriting and he showed the clerk identification.

After buying the shells, he gave them to Wilson once they were outside the store. He drove back to the 1150 building and pulled up in front of the breezeway. He got out of the car and sat on the front of it. Wilson walked up to George Boone, who was standing right outside the breezeway.

Boone asked Wilson, "Did you get them?" Wilson said, "Yes." Both of them went into the 1150 building.

On July 17, 1970, Knights did not stand at the door of the drugstore and ask Marv Solomon for any .30-.30 bullets. Knights testified he had heard Solomon in court relate a conversation with him. Knights stated that that conversation never occurred. He never told Solomon he had two .30-.30's and a Winchester and a Savage.

On July 17, 1970, at or about 7 p.m., he was in front of the 1150 building. There he saw Mrs. Maten, Ray Gardner, Norman Gibson and Norman's father and several children.

Defendant Knights saw one of the police officers when he fell. At that time Knights was sitting on the front of his car in front of the 1150 building, talking with Mr. Gibson and Ray about relining some brakeshoes on Ray's car. They heard a shot. Knights did not pay any attention. Then they heard another shot and people started hollering. Knights looked towards the ball field and saw one policeman lying down and the other one fall. The latter was about on his knees and then fell down. It was not unusual to hear shots in the Cabrini-Green area.

Knights testified that when he saw the officer fall, chaos took place. People started running and hollering. Knights started getting the children into the building. Some of them had started running towards the ball field. He grabbed some of them and ran into the building. He does not know whether, as he did that, he saw Marsha Jones. He did not know which child he carried or if he carried a child into Apartment 207 or just to the porch. Mrs. Maten was out there. When he got in the breezeway he saw Mrs. Welch. She had just come down the stairwell. As he was going inside the building, he did not hear any other shots. Later he heard shots when he was in Apartment 207, where Mrs. Welch lived. He went there to get out of the way because he knew there was going to be more shooting. He did not know how long he stayed there. He left later. When sitting out in front of the 1150 building he had been drinking wine.

He did not shoot and kill the two police officers on July 17, 1970. He did not think he was in the 1150 building that day before the police were shot. On that date he did not belong to any youth gang, street gang or group. He has never been a member of or belonged to any street gang or youth group or gang. The vision in his right eye was very poor.

On cross-examination, defendant Knights said that on July 16, 1970, he did not have a driver's license. When driving to Hammond, Indiana, Wilson did not at any time say he was going to buy shells. Knights did not remember Morgenthaler selling the shells. He could not have shown the latter a driver's license because he did not have one and he was not with four or five people when he went into the Millikan store to buy the .30-.30 shells. The clerk placed the shells on the counter and Knights picked them

up to show them to Wilson and asked if they were the kind he wanted. The clerk put the shells in a bag.

Knights never said to one of his friends or to anyone on July 17, 1970, about 9 or 10 p.m., "I told you I would get two of those white mother fuckers." Knights has never killed anyone.

Knights does not know Jerry Davis, Jake Davis or Robert Curry. He did not say to Robert Curry, "Why [do] the pigs have to umpire baseball games?" He did not remember talking to Officer Crisler about getting a gun. He never did. He does not remember yelling at Crisler out of a window and saying, "I've got it, Cris."

Knights' first recollection of July 17, 1970, was when the police officers got shot. That is the first thing he remembers about that day. At the time the police were shot, he was sitting on the closed trunk of his car. He did not know how long he had been there. He had been in the area all day. His car was parked in the east parking lot, directly in front of the breezeway of the 1150 building. When sitting on the trunk, he was facing the breezeway. He could not recall whether he heard any shots before he saw a policeman fall. He remembered hearing one shot before this policeman fell; he heard two shots. He looked toward the south end of the 1150 building, because that is where the shots sounded like they were coming from.

After he heard one shot, he yelled, "Two police have been shot." He was talking to George Williams, who was in his bathroom window and who had stuck his head out the window and asked Knights what had happened. At that time Knights was standing either in the walkway leading to the breezeway or on the sidewalk. He had no trouble hearing Williams, who was up on the 4th floor. Knights did not shout, "A policeman has been shot." He did not see Mrs. Maten run out from the stairs after he yelled. When he saw her, she was out on the walkway. Knights testified that all he heard was one shot. He also said he might have heard "shots" some time before the police were shot, but he does not remember any.

After Williams had hollered down and Knights told him what had happened, Knights started getting the children into the building. He thinks he picked up one of them. He ran into the building to get out of the way from in front of the building because there was going to be some more shooting. There was more—from the ball field, from the fire lane, from the corner of the building, from the back of the building, from the air and from the top of cars and from behind cars. He did not see anybody shooting at that time. Later he saw a lot of people shooting. It could have been that as he ran through the breezeway he saw police shooting at the corner of the 1150 building, in the fire lane, the parking lots and a little field between two playgrounds. The police were shooting at

the 1157 North Cleveland building and at the 1117-1119 North Cleveland building.

He went up the stairs. There were a lot of people trying to get up the stairs at the same time, including Mrs. Welch. He went to Apartment 207 and Mrs. Welch came in right behind him. Knights did not know which child he had carried or whether he carried a child into the apartment or just to the porch. He left there after the shooting subsided a bit. He couldn't say how long he stayed there. He went downstairs. There was still shooting going on, more than when he had gone up.

Knights said he told his lawyer that he (Knights) had bought two boxes of .30-.30 shells for someone other than Boizell Wilson. He did not at another time tell his lawyer that he had bought the shells for some person other than Boizell Wilson or George Boone. He had never, through his lawyer, said he bought the .30-.30 shells for someone other than Boizell Wilson or George Boone. People's Exhibit 50, the affidavit of defendant Knights' lawyer filed in support of a motion for severance, says that Knights bought the .30-.30 shells for someone other than Boizell Wilson or George Boone.

Defendant Veal did not testify.

Norman Jefferson testified in rebuttal that on July 17, 1970, he was a security guard employed by Wells-Fargo, working in the Cabrini-Green area. At about 6:40 p.m. on that date he was with three other security guards in front of the 1150 building. He saw defendant Knights standing in the parking lot. Knights, who was proceeding into the 1150 building, walked up to him and the other three guards and said to him that he wanted Jefferson's .38 pistol. Knights said, "We will get 4 guns today." Jefferson told Knights, as he had before, that the only way Knights would get his gun would be over his dead body. Knights smiled and said that could be arranged. Knights then went into the 1150 building.

Jefferson and the three guards remained in front of the breezeway. Later Jefferson heard a shot and moved to the edge of the building, out in the parking lot. At that time he saw two police coming across the field toward the 1150 building. As they came even with that building, walking east, another shot rang out. Both officers fell. Jefferson went back to the front of the 1150 building. He and the other guards were trying to get all the tenants and bystanders into the breezeway, away from the gunfire, so they would not be hit. Jefferson did not see Knights at that time. He saw him later. Knights came up to Jefferson and said, "What is going on? What are all the policemen shooting for." Jefferson and the other security guards told him two policemen had been shot. Knights went out to a parking lot at the 1150 building. That was the last time Jefferson saw Knights.

Police officer John Northen testified in rebuttal that he saw Earline

Maten on March 13, 1971, in her apartment, No. 304 at 1150 North Sedgwick. He went with her in an unmarked police car to approximately 1100 North Clark. He had a discussion with her about defendant Knights. She told him that Knights had come to Apartment 207 about five minutes after the shots were fired and said, "Don't worry, everything's all right" or words to that effect. Northen testified that she never told him that she had seen Knights at the time of the shooting.

Virgil Cross, assistant maintenance superintendent at Cabrini-Green, testified in rebuttal that he had known defendant Knights for two or three years and that he had known Boizell Wilson approximately two years. Both were janitor's helpers and he had seen both of them together. They had worked together for several months, possibly a year. The last time Cross had seen the two together was twice on Saturday morning, July 18, 1970, the morning after the shooting of the two policemen.

Cross further testified that janitor's helpers on occasion have access to apartment keys. Defendant Knights was assigned as a janitor's helper to the 1150 side of the building. Janitor's helpers were not authorized to get keys to clean up vacant apartments. The only person who could was the assistant head janitor, but that the rules concerning access to keys have not always been enforced. This lack of enforcement at times permitted janitor's helpers to have access to the keys. When tenants vacate apartments, they do not always turn in their keys.

Paul Williams, a 14-year-old boy, who had known defendant Knights for 3½ years, testified in rebuttal that about two or three hours before the police were shot he, with Vernon Baker, had seen Knights on the 8th or 9th floor of the 1150 building with another person. At the request of the court and the prosecutor, he did not name that person. Knights gave a .22 rifle to that person, who, in turn, gave it to Williams. Knights and the unnamed person remained on the 8th or 9th floor, while Williams and Baker went downstairs. Williams saw neither Knights nor the unnamed person thereafter. Williams' statement about Knights giving a rifle to another person was made for the first time at trial.

Police officer John Sandifer, who had testified in the State's case-in-chief, testified in rebuttal that the guns of the two slain police officers were in their holsters when he had helped in the officers' removal. Neither of the officers had helped himself into the squad car under his own power. There was a lot of shooting coming into the ball field around the two officers during their removal.

In surrebuttal, the attorney for defendant Knights testified that he had heard Knights under cross-examination state he had never told his attorney that he (Knights) had bought bullets for Veal. His attorney stated that Knights never told him he had purchased the bullets for Veal; that Knights always said he purchased bullets in Hammond with Boizell

Wilson and that when Knights came back to Chicago he saw Wilson and George Boone enter the 1150 building.

Knights' attorney testified that the motion and petition for severance on behalf of Knights were prepared by him and do not contain a statement that Knights told the witness he had purchased the bullets for Veal. The petition for severance stated that defendant Knights would claim that the purchase of the .30-.30 shells was for Veal and that Veal would claim it was for Knights. This information had come to the witness from Boizell Wilson and Knights' attorney swore that the petition was true to the best of his knowledge, information and belief. In the motion for severance there is no mention of Boizell Wilson.

Knights' attorney further testified that in numerous conversations with Knights since July 17, 1970, Knights had never told him that he (Knights) purchased the bullets for or on behalf of Veal and the attorney has never, in any shape, form or fashion, told anyone that Knights said he purchased the bullets for Veal.

Knights' attorney testified that he had had a subpoena served on Boizell Wilson; that Wilson had stated to the attorney, "I dare you to call me. You better not call me. If you call me, I'm going to implicate everybody in the purchase of the bullets" or words to that effect. At one point, Wilson named Bennett in the purchase of the bullets. Wilson also said he was going to put it all on the defendants, which included Knights. The attorney was going to call Wilson as a court's witness. He did call him, but did not ask that he be made a court's witness. Wilson came to the witness stand, was sworn and gave his name. After he had testified to his name, Marshall Knights drove him somewhere. Wilson returned to court the next day, but Knights' attorney didn't get to him. When the attorney arranged to call him, Wilson was not there. Knights' attorney testified he does not know where Wilson is now; that he (the attorney) had unsuccessfully taken further steps to obtain Wilson's presence in court. Just before the defendant Knights rested, the attorney asked for a warrant for the arrest of Wilson because he did not obey the court's ruling to come back the next day.

After arguments and instructions, the jury found defendants Veal and Knights guilty of the murders of both Sergeant Severin and Officer Rizzato.

Defendants filed a lengthy motion for a new trial. Extended hearings were had on two of the grounds stated in that motion: newly discovered evidence and the knowing use by the State of perjured testimony.

At the hearings Jake Davis, Jerry Davis and Paul Williams, who had testified for the State, recanted their trial testimony which had implicated the defendants. All three testified that the State had used force and threats to make them testify against the defendants. In addition, they testified

that the assistant State's attorneys and some of the police officers knew that their testimony at trial and before the grand jury was false.

In rebuttal, the State called the two assistant State's attorneys who had prosecuted the case and four police officers. They all explicitly denied the use of force or threats and denied that they had told the three witnesses what to testify to.

In his testimony on the hearings on the post-trial motion, Jake Davis admitted that he had been in the Cabrini-Green area about the time the two police were shot and that he had seen defendant Veal in that area after the shooting.

Jerry Davis also admitted that he had been in the vicinity of the Cabrini-Green area and that he had seen defendants in the vicinity shortly after the shooting.

Jerry and Jake Davis also testified at the hearings, as they had in part at the trial, that they had been moved out of the Cabrini-Green area until they testified, having been sent first to a police camp, twice to their grandmother's in Mississippi, to an apartment and to a motel with a police guard and that they had also been placed on probation by the Juvenile Court in order to keep them out of the Cabrini-Green area.

Paul Williams testified that he was in the Cabrini-Green area at the time of the shootings and that he had seen defendant Veal shortly before the shootings. He also testified that he had been sent to the Sheridan School for Boys at the request of one of the assistant State's attorneys and had given false testimony at the trial by the promise of that assistant State's attorney of an early release from Sheridan.

One of the assistant State's attorneys explicitly denied he ever told the Davis brothers to lie in court or that anyone in his presence ever attempted to force them to testify against defendants. He further testified that they had never complained to him of any beatings. He also testified that he had talked with Paul Williams a number of times before the trial but that he had never told him to lie and had never promised him an early discharge from Sheridan in return for his testimony.

The other assistant State's attorney also specifically denied he had ever told the three witnesses to lie under oath or that Jake Davis had been told in his presence to lie under oath. He further denied that he or anyone in his presence had ever intimidated the Davis brothers or that they had ever complained to him of mistreatment.

Investigator Skelly testified that he had never abused either of the Davises and that he never told the Davises to testify falsely against the defendants. He further testified that he had learned from his investigation that neither police officer had been shot from Apartment 603. He further testified that Jake Davis had told him on July 24, 1971, that he did not at any time see Knights in the window of Apartment 603 shooting at the

officers on the ball field. Officer Morask testified he had never threatened or abused the Davis twins or told them how to testify, nor did anyone in his presence do so.

At the conclusion of the post-trial hearings, the trial court made lengthy findings of fact. He found that the recantations of Jake and Jerry Davis and of Paul Williams were not credible and that their testimony at trial was corroborated by other evidence and other witnesses. He made specific mention of the difference between their demeanors at the post-trial hearings and at the trial, that these three witnesses were friends of defendant Veal and that they and Veal were members of the same gang. The court also made note of the fact that both before and during the trial the three witnesses had many opportunities to complain, if it were true, that the State was forcing them to lie under oath, but that they made no such complaints either to their relatives, their attorneys, the judges in the juvenile court or to the trial court at the trial. He further found that the evidence did not sustain the claim of defendants that Jake and Jerry Davis had been captives of the State until after the completion of the trial. The court further stated that Jake Davis had had the opportunity, during his conference in chambers with the court following his testimony, to make known any complaints he had, but that he made no complaints of misconduct by the State. The court also stated that the claim by defendants that he had ordered the court reporter in that conference in chambers not to take down such complaints was untrue. He further found that there was no misconduct on the part of the State and that the evidence on the post-trial hearings was not newly discovered evidence sufficient to set aside the jury's verdict and grant a new trial.

We turn now to defendants' contentions on appeal. The State argues that defendants have waived almost all of the contentions advanced in this court, either through failure to properly abstract them or to specify them in their post-trial motion or to preserve them properly through objections during the trial. Although the State's position has merit, we have elected to consider defendants' contentions.

Defendants contend that their constitutional right to a fair trial was violated by the State's failure to disclose that the Davis brothers had pending juvenile charges at the time they testified at trial. They argue that the pendency of those charges was information favorable to the defendants in that it tended to show the interest or bias of Jake and Jerry Davis.

It is beyond dispute that information favorable to an accused must be disclosed by the State. The United States Supreme Court in *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, fashioned the rule for the constitutional right to disclosure:

"We now hold that the suppression by the prosecution of

evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196.

■■■ Defendants requested that the State disclose "the criminal record and pending criminal cases, if any, of those persons the State may call as witnesses." Nothing in the record indicates that the defendants requested information concerning the Davis brothers juvenile records. Although the *Brady* holding states that the favorable information must be requested, the failure of the defendants to request information is not in itself dispositive of the disclosure issue. (See *People v. Jones* (1977), 66 Ill. 2d 152, 361 N.E.2d 1104.) Information may be so significant that the State's duty to disclose is not dependent upon the defendants' request. (See *United States v. Agurs* (1976), 427 U.S. 97, 110, 49 L. Ed. 2d 342, 96 S. Ct. 2392.) The standard to be applied is the materiality of the information, which depends upon a review of the record. (*Agurs,* 427 U.S. 97, 112-113, 49 L. Ed. 2d 342, 355, 96 S. Ct. 2392, 2402.) The *Agurs* court stated:

" * * * If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." 427 U.S. 97, 112-13, 49 L. Ed. 2d 342, 355, 96 S. Ct. 2392, 2402.

Although there was no request for information concerning the juvenile records of the Davis brothers, under *Agurs* we must consider the significance of the juvenile charges pending against the Davis brothers in light of the entire record. No criminal charges were pending against the Davis brothers at the time of trial. Their juvenile petitions concerned truancy and neglect. After a careful study of the record, we conclude that the information concerning the juvenile proceedings against the Davis brothers is not sufficient to create a reasonable doubt of defendants' guilt.

Defendants argue that *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105, supports their argument that they were denied the right to a fair trial. We disagree. *Davis* concerned the refusal of the trial court to allow a prosecution witness to be questioned about his juvenile record. Because the existence of juvenile proceedings was not known to defendants, no question of such a refusal is presented by this record; under *Agurs,* the failure to disclose its existence, when viewed in the light of the entire record, did not deny defendants a fair trial.

Defendants also contend that the State violated their right to a fair trial by allowing Jake Davis to give testimony which was either false or incorrect, or both, concerning the Davis brothers pending juvenile

charges. They argue that Jake Davis perjured himself when he testified that (1) no juvenile charges were pending against him at the time of trial, (2) the charges were placed against him because he had been shot, and (3) no charges were pending against Jerry Davis at the time of trial. The State argues: to the extent Jake Davis understood the juvenile court proceedings he told the truth; at the time of trial no charges were pending against him, although he was still on probation; he was placed on probation for being in the vicinity of the Cabrini-Green project on the day he was shot, not because he was shot; and Jerry Davis had had a MINS (minor in need of supervision) petition filed against him, but that it is not a charge.

■ It is clear that convictions which result from the knowing use of perjured testimony or from the failure to correct false testimony violate a defendant's right to a fair trial under the fourteenth amendment of the Federal Constitution (*Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173); but defendants have the burden of establishing by clear and convincing proof that perjured testimony was used in a manner proscribed by *Napue*. (*People v. Bracey* (1972), 51 Ill. 2d 514, 283 N.E.2d 685.) Once defendants have met their burden, the State must show beyond a reasonable doubt that the perjured testimony did not contribute to defendants' convictions. *Bracey,* at 520.

In a lengthy post-trial hearing, defendants contended that the Davis brothers were captives of the State which resulted in false testimony by them and that the State knowingly used the perjured testimony of Jake Davis concerning juvenile charges against the Davis brothers to convict defendants. The trial judge found that (1) the evidence did not sustain defendants' claim that the Davis brothers were captives of the State until after the completion of the trial, (2) there was no misconduct on the part of the State, and (3) with reference to Jake Davis' trial testimony concerning the juvenile court: "[S]uch matters are not charges but, in any case, to the extent that the trial assertions of Jake Davis were not clear on this point, they were subject to any appropriate cross-examination the defense saw fit. There is no reason to believe that Jake Davis did not tell the truth, at trial, on this subject, as he understood it to be, and the defense had three weeks after he so testified but while the jury was still sitting to investigate his testimony." The trial court further found that the evidence on the post-trial hearing was not newly discovered evidence sufficient to set aside the jury's verdict and grant a new trial.

■■ The findings of a trial court will not be reversed unless they are contrary to the manifest weight of the evidence. (*People v. Bracey* (1972), 51 Ill. 2d 514, 283 N.E.2d 685; *People v. Sims* (1974), 20 Ill. App. 3d 1068, 313 N.E.2d 663.) From our examination of the record, we find that the trial court's findings are not contrary to the manifest weight of the

evidence. Further, the record amply demonstrates that beyond a reasonable doubt Jake Davis' statements concerning the juvenile charges did not contribute to the verdict of guilty. (See *People v. Martin* (1974), 56 Ill. 2d 322, 307 N.E.2d 388.) The evidence of the Davis brothers' involvement with the juvenile authorities revealed at trial created an unfavorable, not a favorable, impression as to them. In sum, Jake Davis' testimony may have been confusing and inconsistent, but we are convinced that defendants have failed to show it was perjured. Clearly, the testimony was harmless beyond a reasonable doubt on this record. Defendants are entitled neither to a reversal of their convictions nor to a new trial because of this claimed error.

Defendants argue that there were other instances of prosecutorial suppression of information favorable to them and that their convictions should be reversed because the suppressed evidence denied them a fair trial.

The first is of Jackie Furtell's statement that she heard shots and saw sparks from the 13th and 17th floors of the 1150 North Sedgwick building when the policemen were shot. Defense counsel read her statement into the record and later she testified in a similar way when called by the defense. We fail to see how her statement was suppressed by the State. Indeed, a number of the State's witnesses gave testimony that shots came from several directions, including the upper floors of that building. Further, it clearly does not create a reasonable doubt of guilt that does not otherwise exist. Similarly, the claimed suppression of the statement of Auretha Outlaw, who had told police officers that she heard shots from the 1150 North Sedgwick building, is without merit. It does not create a reasonable doubt of guilt that does not otherwise exist.

■■ Defendants contend that an inventory slip listing the weapons seized at 1119 Cleveland and 1150 Sedgwick also was suppressed by the State. The record reflects that defense counsel saw the inventory slip at trial. Defendant Knights' attorney had visited the Chicago Police Department Crime Laboratory prior to trial and had interviewed personnel about the weapons. We fail to see how the information regarding other seized weapons was suppressed. Even if it had been suppressed, statements of defense counsel at trial regarding weapons not alleged to be the murder weapons indicate that defendants considered the other weapons to be immaterial. Clearly information which the defense considered immaterial at trial will not be found on appeal to be so material to the defendant that a *Brady* violation exists.

Defendants further contend that the State suppressed information regarding a statement that defendant Veal made to Officer Curtis Crisler. Defendants argue that the discovery order required the State to produce a list of witnesses to oral statements by defendants and that the State's

response was that there were no oral statements by defendants. At trial, Officer Crisler testified that sometime in July 1970, prior to the shooting, Johnny Veal told him that he had a rifle. The rifle's lever action did not work properly. Veal wanted to know where he could get it repaired. Crisler did not see the rifle. Veal refused to show it to Crisler. On cross-examination, Crisler stated that he made no report of this conversation to anyone. Defendants argue that this testimony was improperly admitted because of the State's failure to comply with the discovery order.

■■ Although defendants' motion for discovery is part of the record, we are unable to find any written answer by the State. However, in response to argument in the trial court, an assistant State's attorney stated that it was the State's position that what Veal said to Crisler was not a statement subject to discovery. At the time of trial the applicable statute required the State to produce a list of witnesses to the making of an oral confession. (Ill. Rev. Stat. 1969, ch. 38, par. 114—10.) Veal's statement as testified to by Officer Crisler was not an oral confession, but at most an admission. (*People v. Georgev* (1967), 38 Ill. 2d 165, 230 N.E.2d 851.) Disclosure of it was not required by the statute. Nor was disclosure required under *Brady* because the statement could not be construed as favorable to Veal.

■■ Defendants also argue that the State's failure to produce a report by Officer Bolling denied them a fair trial. At trial, Bolling testified that Knights' reputations for peaceableness and truthfulness in the community were bad. Defendants demanded the production of Bolling's report on Knights. Bolling stated that the only report he had made about Knights did not concern Bolling's testimony in this case. The trial judge ordered the production of the report. Bolling further testified that a search of police files failed to locate the report. There is no evidence in the record that the prosecution or the police were responsible for its unavailability. Defendants were not denied a fair trial with respect to this report.

■■ Defendants also contend that the State suppressed evidence by calling Paul Williams as a rebuttal witness in order to prevent defendants from using his grand jury testimony in the State's case-in-chief. On rebuttal, Williams testified that about two or three hours before the shooting he had seen defendant Knights on the eighth or ninth floor of the 1150 North Sedgwick building. Williams' testimony before the grand jury was that after the shooting of the police officers he saw Johnny Veal standing by a window on the sixth floor of the 1150 Sedgwick building hugging a girl. If Williams had testified in the State's case-in-chief concerning Knights as he did on rebuttal, his grand jury testimony as to Veal clearly would have been as irrelevant there as it was in rebuttal. The admission of testimony on rebuttal rests within the trial court's discretion. (*People v. Lion* (1957), 10 Ill. 2d 208, 139 N.E.2d 757; *People v. Carbona* (1975), 27 Ill. App. 3d 988, 327 N.E.2d 546, *cert. denied* (1976), 424 U.S.

914, 47 L. Ed. 2d 319, 96 S. Ct. 1114; *People v. Shannon* (1968), 94 Ill. App. 2d 110, 236 N.E.2d 369.) Evidence which tends to contradict, disprove, explain or repel is not precluded from admission in rebuttal because it might have been offered in the case-in-chief. (*People v. Daugherty* (1969), 43 Ill. 2d 251, 253 N.E.2d 389; *Carbona.*) Williams' testimony in rebuttal contradicted Knights' testimony that he did not think that on July 17, 1970, he had been in the 1150 building before the police were shot. Calling Williams in rebuttal cannot be construed to be a suppression of evidence.

Defendants assert that the State also suppressed statements defendant Knights had made to "Nan Harper, Marvin Solomon, Norman Jefferson, Roosevelt Moore and others" as well as statements defendants made to the Davis brothers.

The State provided the names of these witnesses to the defendants prior to trial. At the trial, defendants received copies of reports of the statements or of grand jury transcripts of the witnesses' testimony. There was no reversible error in the procedure followed.

Defendants were not denied a fair trial.

Defendants also argue that they were deprived of a fair trial, in violation of their constitutional rights, "by reason of the totality of the circumstances surrounding the handling and administration of the jury during the trial." Though the defendants stress that their argument is based on the "totality" of events alleged to be prejudicial, we must consider each incident individually before determining whether all, cumulatively, resulted in reversible error.

■■ The jury was squestered during the trial. However, on a Friday, the court learned that there had been a death in the family of one juror and proposed to allow the juror to attend the funeral in Wisconsin over the weekend. Defense counsel expressly agreed to this procedure at trial, after first suggesting that the juror be discharged and one alternate appointed to take his or her place. On appeal it is argued that the court somehow erred in breaking "its own order of sequestration." We disagree. The applicable statute specifically permits such a separation of a juror before submission of the cause and during a recess of the proceedings, unless the court finds a probability of prejudice to either the defendant or the State will result from the separation. (Ill. Rev. Stat. 1969, ch. 38, par. 115—4(m).) The matter was within the sound discretion of the trial judge and here, where both defense attorneys specifically agreed to the temporary separation, there was certainly no abuse of discretion. *People v. Yonder* (1969), 44 Ill. 2d 376, 256 N.E.2d 321, *cert. denied* (1970), 397 U.S. 975, 25 L. Ed. 2d 270, 90 S. Ct. 1094.

Defendants complain of several instances of communication between the bailiffs and the jury. First, on the 11th day of trial, several jurors, including jurors Ottoman and Heffner, told the bailiffs at the hotel where

they were sequestered that they were worried about their personal safety. The bailiffs informed the judge of this occurrence at the next opportunity, when the trial re-convened. Second, the fact that one juror had had a death in the family, discussed above, was communicated to the bailiff who reported it to the court. Third, several jurors during a recess told a bailiff that too much time was being wasted at trial. This was duly reported by the bailiff to the court. Fourth, two or more jurors told a bailiff that they wanted to talk to the court about a remark that had allegedly been made by a juror during a prosecutor's question of a witness. This was also reported to the court. Fifth, defendants contend that the bailiffs went to the jury and sought witnesses from among their number to the fact that a juror was sleeping during closing arguments. The State controverts this allegation and our examination of the record does not reveal that the bailiffs solicited comments. Notes were brought by the bailiffs to the court from two jurors, indicating that they had seen the juror sleeping, but the record does not show that the bailiffs went to the jury and asked for witnesses.

■ In each instance, the court revealed the fact of the communication to the parties as soon as court re-convened. The defense never objected to the fact that the bailiffs were conveying messages to the court and never moved for a mistrial after any of these incidents. None of the matters discussed or communicated through the bailiffs had any bearing on the merits of the criminal trial. There simply was no prejudice to defendants by reason of the communications. In Illinois we do not have a *per se* rule of presuming prejudice from the mere fact of a third person's communication with the jury; it must appear from the record that prejudice resulted or that there was an intent to influence the jury's decision. (*People v. Mills* (1968), 40 Ill. 2d 4, 237 N.E.2d 697; *People v. Harris* (1978), 57 Ill. App. 3d 639, 373 N.E.2d 593.) Furthermore, it is proper for the jury to communicate its needs to the court through "the officer in attendance," as explained by the court in *Fisher v. People* (1859), 23 Ill. 218, a case relied on by defendants.

■■ Other cases relied on by defendants are factually distinguishable, in that in each there was a likelihood that the bailiff had influenced the jury's verdict. In *Mattox v. United States* (1892), 146 U.S. 140, 36 L. Ed. 917, 13 S. Ct. 50, the bailiff allegedly told the jury that the defendant had killed two other men besides the person he was being tried for killing and that the defendant had attempted to commit another offense during the trial. In *Turner v. Louisiana* (1965), 379 U.S. 466, 13 L. Ed. 2d 424, 85 S. Ct. 546, the two deputy sheriffs who attended to the jurors during the three-day trial, escorting them to restaurants and to their lodgings, and conversing with them on "various and sundry matters" in a friendly

manner, testified at the trial and were key witnesses for the prosecution. In *Parker v. Gladden* (1966), 385 U.S. 363, 17 L. Ed. 2d 420, 87 S. Ct. 468, the bailiff had told one juror that the defendant was "wicked" and guilty, and another juror that if there was anything wrong with the verdict "the Supreme Court will correct it." Nothing even remotely resembling this sort of conduct is revealed in this record or even alleged by defendants. We are convinced that there was no error committed or prejudice to the defendants because of the jurors communicating with the court through the bailiffs.

The defendants also argue that several communications between the judge and the jury denied them a fair trial. The first instance occurred after the above-mentioned communication through the bailiffs that some of the jurors were fearful for their safety. The judge spoke to juror Ottoman individually in chambers and the juror expressed concern with whether the trial would be concluded by August 27. The court told her that he was reasonably certain it would be. (It was.) She also told the court that she was worried because she had seen a spectator in the courtroom taking notes and she was afraid that the spectator had taken down her address. The court told her not to be alarmed and that during a public trial anyone can take notes. The court then spoke to juror Heffner individually in chambers. The juror said to the judge that before the trial began he did not know that youth gangs were involved and since he had heard testimony about gangs he feared for his family's safety. The judge told the juror that gangs were not on trial, two individuals were on trial and that he should not worry. The court was also told by the bailiffs that several other jurors had expressed general fears for their safety. The court related all of the above to the defendants, their attorneys and the prosecution. Together, the court, defense counsel and the prosecutors composed a statement to the jury to alleviate their fears. The content of this statement is not at issue here. The court delivered the statement orally to the jury in the jury room, with the court reporter present, outside the presence of the defendants and the defense counsel at defense counsel's request. No motions for mistrial or objections were made by the defense to any of the above occurrences.

The second occurrence took place during a recess of the trial. A bailiff told the judge, who was eating lunch, that some jurors wished to talk to him. The court refused to talk to them, sending word through the bailiff that if the jurors wished to communicate with him, they should put the question or information in writing. Later, such a note was received, the content of which related to a comment allegedly made by a juror during the prosecutor's examination of witness. On appeal, defendants argue that the court's instruction to the jury to communicate by note was improper because the instruction was given outside the presence of defendants.

The third instance of allegedly improper jury-court communication occurred when, during the jury's deliberations, the court received a note from the jury stating, "Interpretation of two items." The court returned a note through the bailiff which stated, "Which items?" The jury sent back to the court through the bailiff three jury instructions. The court conferred with defense counsel and the prosecutors and composed his response with their consent. The response was to return the three instructions with a note stating, "Please read all instructions." Defendants now argue that the "ultimate error" was the court sending the note stating, "Which items?" without first consulting defense counsel. But there was no objection or motion for mistrial made at the time the court informed all that the notes had been received, and the final note to the jury was composed and delivered with defense counsel's consent.

■■■■ There was no prejudice to the defendants' right to a fair trial by reason of any of these communications; and, in the absence of a provable claim or proof of specific prejudice, a jury verdict will not be set aside because of allegedly improper communication with the court. (*People ex rel. Walker v. Pate* (1973), 53 Ill. 2d 485, 292 N.E.2d 387.) Juror Ottoman's concern with when the trial would be finished is not evidence of her prejudice, especially since the trial concluded and the verdict was rendered several days before the August 27 date she was concerned about. *People v. Peterson* (1973), 15 Ill. App. 3d 110, 303 N.E.2d 514, is plainly distinguishable because there the juror allegedly was praying that the defendant would plead guilty so that she could go home. And the concerns of both juror Ottoman and juror Heffner with danger to themselves or their families reveal, if any prejudice at all, prejudice to the State; if the jurors were afraid of revenge by defendants or their friends, this fear should more likely cause them to acquit rather than convict. The communications between these jurors and the court, in private, were not error because the matters discussed were not related to the issues of defendants' guilt or innocence and were acquiesced in by defense counsel through their aid in composing an instruction on fear which was delivered by the court at their request. (*People v. Pierce* (1972), 52 Ill. 2d 7, 284 N.E.2d 279.) And the two requests by the court to the jury, allegedly made outside of defendants' presence and without consulting them (*i.e.*, to put any communications to the judge in writing and "Which items?"), were not in any way harmful to defendants. The first was repeated by the court during the charge to the jury when the court gave, at defendants' request, an instruction specifically requiring any questions the jury might have of the judge to be in writing and submitted to him through the bailiff. By adopting this instruction themselves, defendants acknowledged that the court's request was proper. (*People v. Savage* (1968), 102 Ill. App. 2d 88, 243 N.E.2d 702.) The second, though termed by defendants the

"ultimate error," is completely harmless. The decision to instruct the jury only to "Please read all instructions" was joined in by defense counsel and is not complained about on appeal. We cannot agree that defendants were prejudiced by any of these communications between the court and the jury. Defendants' argument that some or all of these communications took place outside their presence is not supported by the record. (*People v. Callahan* (1974), 16 Ill. App. 3d 1006, 307 N.E.2d 188.) And even if they did and were not coercive or prejudicial, the verdict will not be set aside. *People v. Tobe* (1971), 49 Ill. 2d 538, 276 N.E.2d 294.

■■ Defendants also argue that two jurors who were excused during the trial and replaced by alternate jurors should not have been excused and that several other jurors should have been excused or examined as to possible prejudice which developed during the trial. The standard to be applied on review is the same as that applied on review of jury selection questions; that is, a determination of whether or not a juror possesses a state of mind which will enable him to give an accused a fair and impartial trial rests in the sound discretion of the trial judge, who will not be reversed unless his determination is shown to be against the manifest weight of the evidence. *People v. Cole* (1973), 54 Ill. 2d 401, 298 N.E.2d 705.

■■■ In this regard, juror Green admitted in the midst of trial to the court that he had consumed a pint of spirits the night before and that he had consumed "a shot" just before the trial continued that morning. It is manifest that this was grave misconduct by the juror (see *People v. King* (1916), 276 Ill. 138, 114 N.E. 601), and the court properly excused him to protect the rights of defendants. The court excused juror Hendricks after personally observing him sleeping during the trial. In each instance, an alternate juror was appointed to take the excused juror's place. The court did not abuse its discretion and the decision to excuse these two inattentive jurors was correct under the circumstances.

■■ It is argued that the court, on its own motion, since defense counsel did not suggest it, should have excused jurors Ottoman and Heffner, who early in the trial had expressed fears for their personal safety. We have discussed this above in another context, and here also conclude that nothing improper occurred. Similarly, it was suggested by defense counsel that the juror who was permitted to attend a funeral be discharged, but all agreed, finally, to permit the juror to go and return to the jury.

■■ It is also argued that the defendants were prejudiced by the failure of the court to conduct a hearing, on the motion of defense counsel, on whether a certain juror had become prejudiced during trial. Defendant Veal's attorney at one point told the court he had received an anonymous telephone call at home, and that the caller told him that juror Gustafson's

son had been beaten by black youths while attending a ball game. Counsel had no firsthand knowledge of the truth or falsity of the caller's statement and did not know whether Gustafson, who was sequestered, had even heard of the incident even if it were a fact. The court denied the motion for a hearing. We believe that the motion was properly denied where there was so little foundation for counsel's suggestion. See *Marzen v. People* (1901), 190 Ill. 81, 60 N.E. 102; *People v. Jackson* (1974), 22 Ill. App. 3d 873, 318 N.E.2d 249.

The suggestion that racism was involved in dismissing jurors Green and Hendricks, who happened to be black, is without merit and will not be dignified by further comment. We note that the jury which found defendants guilty had three black persons as members.

We have considered each of the instances of alleged misconduct, prejudice and error relating to the jury which defendants contend acted to deprive them of a fair trial. We have concluded that in no instance was a constitutional right of the defendants denied. Considering the total effect of the alleged irregularities, we remain convinced that defendants were afforded a fair trial by an impartial jury.

The fourth alleged error claimed by defendants involves the hearing on defendants' motion for a new trial. During the hearing Jake Davis testified and substantially recanted his trial testimony. At the end of his testimony at trial, Jake went into chambers with the court and the court reporter. Jake asked if his testimony was over and the court told him it was. Jake then stated:

"Well, [one of the assistant State's attorneys] said after the testimony that I could go home. Before, everytime I got ready to testify, they'd tell me to tell the truth, then since I told the truth, they mad at me."

The court asked Jake if he wanted to be released to his mother and Jake responded:

"Yeah. He said it were agreed after I testified I could go home. That is the only reason they have been messing with me, since I got shot and went to the police station the police come talking about, 'All we want you for is the trial, after that, you can get killed,' like that."

The court sent the bailiff to find Mrs. Davis. He then told the court reporter to go off the record. When Mrs. Davis arrived, the reporter was instructed to go "on the record" again. The transcript reveals that the court inquired of Mrs. Davis whether she wanted her son to come home and whether she felt he would be safe at home. She responded that she wanted him and that he would be safe, and the court released Jake to her.

However, Jake testified at the post-trial hearing that, during the time designated as off the record in the trial transcript, he told the judge that

the prosecutor had made him lie about defendants Knights and Veal being the killers:

> "The Judge wouldn't let the court reporter take the part down when I was telling him how the State's Attorney and police had made me get on the stand and say this, that it was lying."

Jake further testified that he told the judge that the assistant State's attorneys and the police had threatened him and his mother if he didn't testify, but he did not explain what the threats were.

The court, as stated above, denied the motions for new trial. In addressing this incident in the post-trial testimony of Jake Davis, the court made the following comment:

> "The Court conducted an in camera interview of Jake Davis immediately after his testimony before the jury, all of which is of record. This was at his request and without objection by an counsel in the case. Here was the ideal opportunity for Jake Davis to voice complaint. The Court cannot perceive how Jake Davis could make the allegations he now makes to this same Court, when he did not do so then. Indeed, although the witness told the Court then that the police had been messing with him, he stated affirmatively that he had been told by the prosecution to tell the truth and that he had done so. This certainly is a factor which the Court must consider in weighing his credibility. His assertion now that the Court instructed the official court reporter to expunge his allegations of perjury from the record is outrageously untrue. The alleged 'off the record' comments Jake Davis claims to have made in chambers did not, in fact, occur."

Defense counsel, immediately at the conclusion of the court's announcement of its findings of fact and conclusions of law, moved that the denial of the motion for a new trial based on newly discovered evidence be set aside and a new judge be substituted to re-hear the motion, because the court had acted as both judge and witness in stating that the off-the record declarations Jake Davis claimed to have made did not occur. The court denied the motion. On appeal, defendants argue that the court erred in denying defendants' motion for a new trial and erred in failing to recuse himself, because he acted as a witness to off-the-record events and ruled on his own credibility.

■■ Had the incident of the court stating his version of what occurred outside the record taken place at trial, the action of the trial judge in stepping over the boundary between a finder of fact and a witness to a fact may well have presented a different situation. (*People v. Rivers* (1951), 410 Ill. 410, 102 N.E.2d 303; *People v. Wallenberg* (1962), 24 Ill. 2d 350, 181 N.E.2d 143.) In the case before us, it may be that the court should not have partly based his ruling on an event which took place off the

record but in his presence. But for several reasons, we have concluded that this error, if any, was harmless when all the circumstances are considered.

■■ First, there are indications in the record that defense counsel knew that the question of what occurred during the Jake Davis-judge meeting while the conversation, if any, was off the record would be an issue as early as the cross-examination of Davis during the recantation hearing. Both defense counsel objected to the State inquiring in this area, stating that what was said might not all be on the record and if some was not, it might be necessary to cross-examine the judge. The objections were overruled and thereafter Jake Davis testified as set forth above as to his version of what occurred off the record. Yet not until weeks later, and after the court had denied the motion for new trial based on newly discovered evidence, did the defense move for substitution of judges. "[I]t is a well-settled rule that a petition for a change of venue after the court has ruled on any matter going to the merits of the case comes too late." (*People v. Myers* (1966), 35 Ill. 2d 311, 326-27, 22 N.E.2d 297, 306, *cert. denied* (1967), 385 U.S. 1019, 17 L. Ed. 2d 557, 87 S. Ct. 752.) This rule is followed even where the petition alleges actual prejudice and that the prejudice was not known until after the ruling on an issue. (*People v. Norcutt* (1970), 44 Ill. 2d 256, 255 N.E.2d 442.) Here, where the motion was made only after the court had ruled on the very issue the motion attacked, it came too late.

Second, a motion for new trial based on newly discovered evidence is directed to the discretion of the trial court. (*People v. Watkins* (1975), 34 Ill. App. 3d 369, 340 N.E.2d 92.) This is unavoidably so, because the trial court here had the opportunity to view and note the demeanor of all the witnesses, including the recanting witnesses, when they testified. Considering the length of the trial record and the seven weeks of testimony taken during the hearing at which the recanting witnesses testified, it is apparent that no judge other than the judge who presided at the trial could have properly presided at the hearing on the motion.

Finally, it is clear from the remainder of the court's findings of fact and conclusions of law that he did not place great importance, while considering Jake Davis' hearing testimony, on the incident and the court's own memory of what occurred. The court also considered Jake's failure to complain to defendant Knights' attorney during an unescorted interview in September of 1970; his failure to complain during his stay in Mississippi with his grandmother; his failure to complain during his visits with friends and relatives between September and December of 1970; his failure to complain during various appearances before juvenile court judges, including instances when he was represented by counsel; and his failure to complain during the two days in June of 1971 before he was

housed at the Holiday Inn motel for the trial. During all of these opportunities, Jake was not in the custody of the police or the assistant State's attorneys. The court also indicated that a change in Jake's demeanor was apparent:

"His overall attitude in court at this hearing, combined with the way he answered questions on both direct and cross-examination, is still another factor this court considers in finding that the recanting testimony he gave is not believable."

The court also found that the juvenile proceedings did not influence Jake's trial testimony and that the trial testimony was corroborated by other witnesses and evidence.

We note also that the declaration of Jake made on the record, quoted above, asserts that the prosecutors were angry with him because he had told the truth at trial. This is contradictory of what Jake claims he told the judge off the record and supports the court's statement that the claimed confession of perjury by Jake did not occur.

Defendants' reliance upon *People v. Wilson* (1967), 37 Ill. 2d 617, 230 N.E.2d 194, and *People v. Washington* (1967), 38 Ill. 2d 446, 232 N.E.2d 738, is misplaced because they are cases dealing with post-conviction petition hearings which are limited to consideration of constitutional right deprivations and do not require the hearing court to test the asserted newly-discovered evidence against the evidence presented at trial. *People v. Passaro* (1974), 23 Ill. App. 3d 970, 320 N.E.2d 394 (per curiam), also cited by defendants, is distinguished because the trial court denied a prehearing defense motion for substitution of judges, had himself sworn as a witness, cross-examined defense counsel and then ruled on the motion for new trial. No such extreme set of circumstances is here presented.

For all of the above reasons, we do not disturb the denial of the motion for new trial based on newly discovered evidence nor do we disturb the denial of the motion for substitution of judges made after the court's ruling.

Defendant Veal argues that his conviction must be reversed because the trial court excluded his alibi defense for the reason that he failed to provide the State with a list of his alibi witnesses. He contends that, because at the time of trial the Illinois statutory scheme prevented a defendant's access to a list of the State's alibi rebuttal witnesses, enforcement of the alibi rules against him was a denial of due process of law, on the authority of *Wardius v. Oregon* (1973), 412 U. S. 470, 37 L. Ed. 2d 82, 93 S. Ct. 2208.

Our consideration of this issue requires an examination of the proceedings below in which the matter was raised. Several months before trial, the State filed a motion for discovery, which included a demand for

notice of alibi defense and the names and addresses of witnesses thereto. Defendant Veal did not respond to this demand before trial; nor did he respond at the commencement of trial. However, after the State rested its case-in-chief and after the court had denied a motion for a directed verdict of acquittal, Veal's attorney asked the court to rule on whether Veal would be permitted to call alibi witnesses without first disclosing to the State the witnesses' names and addresses. He stated that four witnesses were prepared to testify that Johnny Veal was at a place other than the place from which the shots were fired, but that these witnesses had told him they would not testify if their names and addresses were revealed before they took the witness stand, because they feared the police would abuse them. Counsel cited both a sixth amendment right to call witnesses and *Williams v. Florida* (1970), 399 U.S. 78, 26 L. Ed. 2d 446, 90 S. Ct. 1893, for that court's ruling that alibi discovery statutes are permissible if the defendant enjoys reciprocal discovery of the State's alibi rebuttal witnesses.

The State objected that the motion was not timely made and questioned whether the alibi witnesses in fact existed. Defense counsel asserted again that they existed, but made no offer to reveal them to the court, in camera or otherwise. Defendant Veal's counsel said:

> "We are saying that we have witnesses. We want to call the witnesses and will not tell the State who the witnesses are. The question now is will your Honor let them testify or not testify. It's just that simple, your Honor. Rule and we'll go on to something else."

The court responded as follows:

> "The answer is the Court will permit them to testify. The court stated previously to defense counsel, I am going to treat the defense the same as it did the State. When the State offered a policeman there who wasn't on the list, I said he could not testify, and at that time, I asked * * * [defense counsel], I stated on the record, gentlemen, I am going to treat the defense the same way as I am treating the prosecution. I want to be fair to both. If you have alibi witnesses, submit those names. To date, they were not given. This is the proper time to give a list of witnesses."

Veal's counsel then said: "I'll not give them until the witness takes the stand" and the court stated: "Then the court will not permit them to testify, and that's the order of court."

Thereafter, defendant Veal did not call any alibi witnesses to testify. His counsel argued that it would be prejudicial to him to call the witness, have the State object and then have the witness excluded by the court for failure to comply with the alibi discovery motion.

At the time of trial, the Code of Criminal Procedure required, upon

request by the prosecution not less than 10 days prior to trial, that the defendant produce in writing, not less than 5 days prior to trial, a notice that he will rely on an alibi defense. The notice was required to contain a statement of where the defendant claimed he was at the time of the offense and a list of the names and addresses of witnesses whom the defendant intended to call to support the defense. (Ill. Rev. Stat. 1969, ch. 38, par. 114—14.) Another section of the Code specifically denied to the defense the right to discover names and addresses of the State's rebuttal witnesses. (Ill. Rev. Stat. 1969, ch. 38, par. 114—9(c).) Our supreme court had held, prior to this trial, that this statutory scheme was not unconstitutional. *People v. Holiday* (1970), 47 Ill. 2d 300, 265 N.E.2d 634.

However, after the trial was concluded, the operation of the statutes above cited was held unconstitutional, first by this court (*People v. Cline* (1974), 19 Ill. App. 3d 446, 311 N.E.2d 599, *aff'd* (1975), 60 Ill. 2d 561, 328 N.E.2d 534) and soon thereafter by our supreme court (*People v. Fields* (1974), 59 Ill. 2d 516, 322 N.E.2d 33, *cert. denied* (1975), 423 U.S. 843, 46 L. Ed. 2d 65, 96 S. Ct. 80), both following the opinion of the United States Supreme Court in *Wardius v. Oregon* (1973), 412 U.S. 470, 472, 37 L. Ed. 2d 82, 86, 93 S. Ct. 2208, 2211, that "the Due Process Clause of the Fourteenth Amendment forbids enforcement of alibi rules unless reciprocal discovery rights are given to criminal defendants." It has been the opinion of this court that *Wardius* is to be applied retroactively. (*People v. Stinson* (1976), 37 Ill. App. 3d 229, 345 N.E.2d 751; *People v. Lucien* (1975), 34 Ill. App. 3d 161, 340 N.E.2d 65.) It has also been held that where the defendant has not been prejudiced by the error his conviction will be affirmed. *Fields; Lucien; Stinson.*

On this record, we do not believe that defendant Veal was prejudiced by the court's order. First, the court did not, in fact, enforce the alibi discovery statute by its order. The court stated that the witnesses would be permitted to testify if the defense provided their names at the onset of the defense's case. Therefore, the court did not seek to enforce those provisions of the statute that required the disclosure to be made at least five days before trial and that it include the specific place where the defendant claims to have been at the time the offense was committed. As the State points out, by revealing the witnesses only just before their testimony, defendant Veal would have effectively achieved the surprise specifically denied to the defendant in *Williams v. Florida* and the effect of fear of police harassment of the witnesses before they could testify was eliminated. Had the witnesses been permitted to testify following disregard of the alibi notice rule, their names and addresses would have been revealed no later than the State's cross-examination of the first alibi witness, for the prosecutor no doubt would have inquired of that first witness who else was present besides the defendant and the witness at

the place other than the scene of the crime at the time the crime was committed. (*People v. Blakes* (1976), 63 Ill. 2d 354, 348 N.E.2d 170.) Indeed, this may have been revealed during the direct examination. Therefore, the use to which the State could have put the information sought to be discovered was effectively canceled by the court permitting the disclosure to be made as late as the moment before the first alibi witness was to be called.

Second, we are greatly troubled by the lack of any real offer of proof concerning these alibi witnesses. Defendant Veal was represented at trial by a very able and experienced member of the criminal trial bar. Yet his only offer on this issue was that he had four witnesses who would testify that defendant Veal was elsewhere than the scene of the crime. We cannot speculate about where these witnesses would have placed defendant Veal or even that they all would have placed him in the same place. Without an offer of proof we have no way of knowing the materiality of the evidence sought to be proved through these witnesses. (*People v. Burris* (1971), 49 Ill. 2d 98, 273 N.E.2d 605; *People v. Bridgeforth* (1972), 51 Ill. 2d 52, 281 N.E.2d 617.) We are also left in doubt as to whether these witnesses in fact existed. Defendant Veal could have revealed his witnesses and their addresses to the trial court in camera and asked that this information be impounded. Other disputed evidentiary documents were impounded in this case at defendants' request. This action would have preserved the record, yet prevented the police from securing the names and addresses of the witnesses, which was the desired objective.

In none of the cases which have reversed convictions because of the operation of the unconstitutional alibi statute has the existence of the alibi witnesses been in doubt. In *Wardius,* both the defendant and his witness testified to the alibi and the testimony of both was stricken on motion of the prosecutor. In *Cline,* the witness was allowed to testify outside the presence of the jury as an offer of proof. But in the case at bar, all we have before this court is the bare assertion of counsel that such witnesses existed and that they would establish an alibi, without one shred of fact to support the assertion. Moreover, defense counsel in criminal cases have been known to change their minds and not call alibi witnesses despite their announced intentions to do so. See *People v. Summers* (1977), 49 Ill. App. 3d 70, 362 N.E.2d 1347.

■■ We conclude therefore that the order of the trial court at the close of the State's case—if defendant Veal did not at that time produce his list of alibi witnesses they would not be permitted to testify—does not require reversal of his conviction. While the statutory scheme was violative of *Wardius,* the court did not attempt to enforce the statute as written. And without an offer of proof, a finding of prejudice to defendant

Veal because of the court's order would be pure speculation. *Burris; Bridgeforth.*

Defendants next contend that the assistant State's attorneys made prejudicial and uncalled for remarks during their closing arguments to the jury.

■■ Defendant Veal asserts that, when the prosecution in its argument to the jury concerning him stated on several occasions that the evidence regarding his involvement was uncontradicted, the prosecution unconstitutionally and prejudicially was calling the jury's attention to his failure to testify or put in a defense. This contention is without merit. The well-settled applicable law is set forth in *People v. Hopkins* (1972), 52 Ill. 2d 1, 6, 284 N.E.2d 283, in which the court affirmed a conviction where the prosecution had stated seven times that the State's evidence was uncontradicted:

> "The prosecution may, however, refer to the fact that the testimony of the State's witnesses is uncontradicted even though the defendant would be the only person who could have contradicted it (*People v. Mills* (1968), 40 Ill. 2d 4, 8-9; *People v. Norman* (1963), 28 Ill. 2d 77, 81), for this involves no more than an accurate summary of the evidence. But the prosecution may not accomplish indirectly what it could not do directly. That the line is not easy to draw is apparent from the fact that the test is often stated in subjective terms—whether 'the reference [was] intended or calculated to direct the attention of the jury to the defendant's neglect to avail himself of his legal right to testify.' *Watt v. People* (1888), 126 Ill. 9, 32; *People v. Mills* (1968), 40 Ill. 2d 4, 8."

The court there also distinguished *People v. Wollenberg* (1967), 37 Ill. 2d 480, 229 N.E.2d 490, relied on by defendant.

From our review of the voluminous record, we find that the comments made were an accurate summary of the evidence and were not intended or calculated to direct the attention of the jury to Veal's failure to avail himself of his legal right to testify.

Defendant Veal also contends that the claimed error in this regard was magnified by the court's refusal to allow him to put in his alibi defense, by the court's refusal to give his tendered instruction regarding the failure of an accused to testify, and its failure to give any instruction on this subject. Because we have found that no error was committed with reference to the alibi testimony, this claim lacks merit. So also does the contention concerning the failure to instruct; the instruction tendered was not the required IPI instruction (Ill. Rev. Stat. 1971, ch. 110A, par. 451(a)), and the jury was properly instructed with reference to the presumption of innocence.

■■ Both defendants contend that they were prejudiced by arguments

which were intended to instill fear in the jurors and by arguments which likened defendants to well known killers. We have examined the portions of the argument to which reference is made and find that as to two instances defendants' objections were sustained and the jury promptly instructed to disregard the remarks. Viewed in the context of the evidence and of the argument in its entirety, reversal is not required. (*People v. Canale* (1972), 52 Ill. 2d 107, 285 N.E.2d 133.) The other portions of the argument to which reference is made were based on the evidence. They were also fair comment on the evils of crime, were a proper urging for the fearless administration of justice and were proper remarks upon the conduct of defendants. *People v. Holmes* (1976), 41 Ill. App. 3d 956, 354 N.E.2d 611.

Defendants next contend that references in the prosecution's argument to defendants' attorneys as "clever," statements applying P. T. Barnum's quotation, "there is a sucker born every minute" to the jury, the likening of the defense case to an octopus squirting ink to cloud vision, and the statement by one of the prosecutors during an answer to an objection by one of the defense attorneys, "That's a lie. That's a lie" all severely prejudiced them.

■■ We have examined in detail the final arguments of over 435 pages (244 by the State and 195 by defendants) and, although some of the remarks "were intemperate and could have been better left unsaid," we find, as we do with other remarks about which complaint is made, that these remarks at the end of a long hard-fought trial were not of such nature as to have influenced the jury in a manner that resulted in substantial prejudice to defendants. (*People v. Nemke* (1970), 46 Ill. 2d 49, 263 N.E.2d 97.) The reference to the octopus is of the same import as a reference to a smokescreen, which was held not to be reversible error in *People v. Calahan* (1976), 42 Ill. App. 3d 994, 356 N.E.2d 942. (See also *People v. Palmer* (1970), 47 Ill. 2d 289, 265 N.E.2d 627, *cert. denied,* 402 U.S. 931, 28 L. Ed. 2d 866, 91 S. Ct. 1532; *People v. Merritt* (1973), 16 Ill. App. 3d 72, 305 N.E.2d 579.) While any remarks that defense counsel had been attempting to trick the jury were improper, we conclude that defendants were not prejudiced by them. They were not of such magnitude as to require a reversal. (*Palmer.*) Further, the jury was instructed that only the testimony of witnesses and exhibits received should be considered, not any statements made by attorneys which were not based on the evidence. (*People v. Gilyard* (1970), 124 Ill. App. 2d 95, 260 N.E.2d 364, *cert. denied* (1971), 402 U.S. 911, 28 L. Ed. 2d 652, 91 S. Ct. 1388.) Similarly, the prosecutor's reference to two of the prosecution's witnesses, when read in context, was merely another comment directed to the fearless administration of the law.

Defendants also contend that reversible error was committed by the

trial judge in that his attitude reflected his opinion as to the veracity of defense counsel. We have examined the portions of the argument to which reference is made and do not agree with defendants' characterization. By the comment objected to and by other comments, it is apparent that the court was admonishing all the attorneys to "stick to the evidence. We don't want to argue anything that wasn't in the record."

■■ Finally, defendants make the general objection that the totality of the prosecution's argument, including the claim that the prosecutors consistently ignored sustained defense objections to improper argument, constitutes reversible error. We do not find this objection meritorious. The governing principles of law relating to claimed errors in argument were succinctly stated by this court in *People v. Mackins* (1974), 17 Ill. App. 3d 24, 46-47, 308 N.E.2d 92, *appeal denied* (1974), 56 Ill. 2d 584, *cert. denied* (1975), 419 U.S. 1111, 42 L. Ed. 2d 808, 95 S. Ct. 786:

> "The tendency of reviewing courts in Illinois, based upon the correct proposition that the trial court has a superior opportunity to determine the propriety of final argument, is that these issues are generally left to the trial court absent a clear abuse of discretion. (*People v. Smothers*, 55 Ill. 2d 172, 176, 302 N.E.2d 324.) It has been held '* * * impractical to lay definite guidelines for what may and what may not be said in arguments to a jury.' (*People v. Gilmore*, 118 Ill. App. 2d 100, 110, 254 N.E.2d 590, quoting from *People v. Wilson*, 116 Ill. App. 2d 205, 253 N.E.2d 472.) Furthermore, the mere occurrence of improper remarks does not by itself constitute reversible error. There must be an additional element for this conclusion to be reached. If we cannot say that the assailed argument constituted 'a material factor in the conviction' (*People v. Clark*, 52 Ill. 2d 374, 390, 288 N.E.2d 363); must have resulted in 'substantial prejudice to the accused' (*People v. Nilsson*, 44 Ill. 2d 244, 248, 255 N.E.2d 432) or that 'the verdict would have been different had the improper closing argument not been made * * *' (*People v. Trice*, 127 Ill. App. 2d 310, 319, 262 N.E.2d 276), then we must necessarily conclude that no prejudicial error resulted from the argument."

From the entire record we find that the portions of the final argument to which objection is made were neither a material factor in defendants' convictions nor resulted in substantial prejudice to them and that the verdict would not have been different had they not been made. No prejudicial error resulted from the argument.

Defendant Veal contends he was not proved guilty beyond a reasonable doubt. The record shows the following:

William Dyson, who belonged to the Black Deuces, testified that at 8 or

8:30 on the night of the shooting of the two police officers he and other members of the Black Deuces saw defendant Veal, who was a member of the Black P. Stones, with Jake Davis, also a member of the Black P. Stones, and others. Veal said to Dyson, "What's happening? You lucky, I had my scope on you, but you left." "See how the Stones do it. Let's see if you all can get three of them." This latter statement was directed to Dyson's group of Black Deuces. Veal also said that "we" shot the police officers. Dyson did not recant his testimony.

George Boone testified that before the shooting, at about 6 p.m., he saw defendant Veal with others in the parking lot at 1150 North Sedgwick and that Veal asked him if the south side apartments on the 6th floor were empty. When told that about all of them up there were vacant, Veal said he guessed he would check it out and entered the 1150 North Sedgwick building. About twenty minutes later, Boone saw Veal with defendant Knights on the sidewalk east of the entrance to that building. At that time Veal was asking others who were also present about some .30-.30's. The last Boone saw of the defendants was in front of that building. Later he saw several police on the baseball field, two of whom started to walk toward the 1150 building. Boone heard a clicking sound of a weapon from that building and, looking up, saw a rifle barrel sticking out of a window six floors up. He was still watching that rifle barrel when it went off. He saw an officer fall. At the time of that shot, neither defendant was in his sight.

Roosevelt Moore testified that he saw the two officers fall when they were shot and that at that time he did not see either defendant Veal or defendant Knights.

Jerry Davis testified that at about noon on the day of the shooting he was with two others and his brother Jake in the parking lot at the 1150 building. There he saw defendant Veal, who told him to go to the sixth floor. They went to Apartment 603, which was vacant and faced Sedgwick Street. Veal looked out the window and said, "Here's where we're going to start to ice the police from." By "ice" Veal meant "kill." Before 6 p.m. that day he again saw Veal.

Jake Davis testified that about 10 a.m. that morning he saw Veal and Knights with another person in the breezeway of the 1150 building. Veal asked Knights, "Are you still going to give me those shells?" and Knights said, "Wait." Veal asked Jake Davis if he had a rifle. Jake said he had a .22 rifle which he got from Veal and that he, Jake, was going to take it over to the 1157 North Sedgwick building. Veal said he would come back and get it. Jake Davis put the rifle there and saw Veal get it. Later that day Jake, who was with his brother Jerry and two others, was told by Veal to go up to the sixth floor with them. They went to Apartment 603 in the 1150 building, where Veal looked out the window and said, "This is where we

are going to start icing the police." He also said we got one in 602, here is the key. He had a key at that time. Later that day, Jake Davis saw Veal in the parking lot with Knights, Sidney Bennett and Vernon Baker. He overheard a conversation in which Knights asked Veal, "We are going to kill the police?" Veal said, "Yes, the police don't mean nothing to me anyway." One of the other two said, "Yes, they fired me up." and the fourth one said, "Yes, they locked me up." Veal then said, "I'll be in 602 or 603" and one of the others said, "I'll be thinking about across the street." Later, Jake Davis saw Veal come out of the 1150 building with a guitar case. Earlier he had seen that case open; inside was a .30-.30 Winchester rifle. Veal went into the 1150 building breezeway. At that time Jake Davis also saw Knights with another person come around that part of the 1150 building which was near the ball field and enter the 1150 building. At that time Jake Davis saw two rifles.

Jake Davis also testified that later that evening, after the police were shot, he saw William Dyson. Present were some Stones, some Blacks and defendant Veal. Veal told Dyson that he, Veal, had had Dyson in his scope at 602 and didn't know how he missed him. Dyson asked Veal who shot the police and Veal said, "We did." When Veal was informed by a Stone that he had heard a police message to pick up Veal for killing the two police officers, Veal said he was going to take a ticket, which meant to leave. Jake Davis asked Veal where he was going and Veal told him and said that Jake Davis was the only one who knew where he was going and if Veal was found he would kill Jake Davis. Veal then left on a bicycle.

George Williams, the janitor at 1150 North Sedgwick, found two rifles in the incinerator room the day after the shooting. Jake Davis testified that on July 16 he had seen defendant Veal with the .30-.30 Winchester found there and that on July 11 defendant Veal had had it in a guitar case.

Officer Curtis Crisler testified that sometime in July (before July 17, 1970) Veal had talked to him about a rifle, asking if he knew where he could get a rifle fixed. Veal said it was a lever action rifle which, when it was cocked, wouldn't pick up the shell, which had to be put in with the thumb.

Ernest Warner, a firearms examiner who test-fired the Savage and Winchester rifles found in the incinerator room, testified that the Savage rifle would not feed a second round of ammunition from the magazine into the chamber.

Robert Curry, a program coordinator for the National Youth Corps, testified that he organized a baseball game on July 17, 1970, at which Sergeant Severin and other policemen were acting as umpires. Sometime between 3:30 p.m. and 6:35 p.m. on that day defendant Veal and Knights, with two others, walked up to him and Knights asked him why he was having the "pigs" umpire the baseball game. One of the others, not

defendant Veal, said that was all right, they would take care of it. Veal was carrying a guitar case and Knights something like an overnight case.

Cedric Langham, a correctional officer in the Cook County Jail, testified that on March 17, 1970, he heard Veal say, in a conversation with other inmates, that when he got out he was going to kill either a couple of well known gang leaders or a couple of cops; that it was just a step to make a reputation.

Defendant Knights' attorney testified on surrebuttal that the petition for severance which he had prepared stated that defendant Knights would claim the purchase of the .30-.30 shells was for Veal and that Veal would claim it was for Knights. This information had come to him from Boizell Wilson.

Defendant Veal did not testify at the trial.

Defendant Knights contends that he was not proved guilty beyond a reasonable doubt. The record discloses the following:

Roosevelt Moore testified that he saw the two officers fall when they were shot and that at that time he did not see either defendant Knights or defendant Veal. About 9 or 10 p.m. that evening he saw Knights, in the company of three other persons, in front of his (Moore's) apartment at 1157 North Sedgwick. He heard Knights say, "I told you I was going to get two of those white mother fuckers." Moore did not recant his testimony.

George Boone testified that at about 6:20 p.m. on July 17, 1970, he saw defendant Knights with defendant Veal on the sidewalk east of the entrance to the 1150 building. There were four or five other men present. Veal asked these men about some .30-.30's, saying, "I need some .30-.30's." Defendant Knights did not say anything. The last that Boone saw of the defendants and the others was in front of the 1150 building. Later, Boone saw several police on the baseball field. Two of the officers started walking toward the 1150 building. Boone heard a clicking sound from the 1150 building and, looking up, he saw a rifle barrel sticking out of a window six floors up. He was still watching that rifle when it went off. He saw an officer fall. At the time of that shot, neither defendant Knights nor defendant Veal was in his sight.

Police officer Thomas Wilczenski testified that after receiving a radio distress call after 7 p.m. on July 17, 1970, he and his partner went to the ball field near the 1150 building, where they saw two police officers lying on the ground. While assisting in placing one of the fallen police officers in a police car, shots which sounded like they were coming from 1150 North Sedgwick and 1119 North Cleveland were striking the ball field. Wilczenski ran to the southeast corner of the 1150 building and looking north along the eastern edge of that building saw Knights, whom he knew, come out of the breezeway with seven or eight children.

Police officer Thomas McNally, Wilczenski's partner, similarly testified that while the two police officers were lying on the ground shots were striking the ground and that he, too, looked along the east side of the 1150 building and saw defendant Knights, whom he knew, outside the breezeway with seven or eight children. This was after he had heard and observed the shots.

Jerry Davis testified that at about 9:45 on the evening of the shooting he was sitting on the steps of 1157 North Sedgwick with others. Defendant Knights, walking with two others, stopped and said to Jerry Davis, "I shot the fuck out of those two police."

Jake Davis testified that about 10 a.m. on the day of the shooting he saw defendant Knights and defendant Veal with another person in the breezeway of the 1150 building. Veal asked Knights, "Are you still going to give me those shells?" and Knights said, "Wait." About two or three hours after that Jake Davis saw defendant Knights with defendant Veal, Sidney Bennett and Vernon Baker in the parking lot. Knights asked Veal, "We are going to kill the police?" and Veal said, "Yes, the police don't mean nothing to me anyway." Knights then asked Sidney Bennett, who said, "Yes, they fired me up." Vernon Baker, when asked by Knights, said, "Yes, they locked me up." Right after that Veal said, "I'll be in 602 or 603" and Baker said, "I'll be thinking about across the street." Later, after Jake Davis had seen Veal coming out of the 1150 building with a guitar case, he saw Knights and Sidney Bennett come around the part of the 1150 building near the ball field and go into the 1150 building. He saw two rifles at that time. Later he saw the police officers walking on the ball field toward the 1150 North Sedgwick building. They reached the south end of the building where the bathroom windows were. Jake Davis heard a loud shot and saw the police officers fall. He saw defendant Knights in a window on the sixth floor of the 1150 building, hanging a rifle out of the window. He also saw Sidney Bennett at a window in Apartment 603.

Robert Curry, a program coordinator for the National Youth Corps, testified that he had organized a baseball game in which Sergeant Severin and other policemen were acting as umpires. Sometime between 3:30 and 6:35 p.m. on July 17, 1970, defendant Knights and defendant Veal, along with two others, walked up to him and defendant Knights asked him why he was having the "pigs" umpire the baseball game. Knights was carrying something like an overnight case and Veal was carrying a guitar case.

Norman Jefferson, a security guard, testified that at about 6:40 p.m. on July 17, 1970, he, with three other security guards in front of the 1150 building, saw Knights standing in the parking lot. Knights, who was going into that building, walked up to Jefferson and the others and said he wanted Jefferson's .38 pistol and said, "We will get 4 guns today." Jefferson told Knights, as he had before, that the only way Knights would

get Jefferson's gun would be over Jefferson's dead body. Knights smiled and said that could be arranged. Knights then went into the 1150 building. Jefferson later heard shots and saw the police officers fall. He and the others went back to the front of the 1150 building and were trying to get all the tenants and bystanders into the breezeway, away from the gunfire. He did not see Knights at that time, but saw him later when Knights asked him, "What is going on? What are all the policemen shooting for." Knights then went out to the parking lot at the 1150 building.

Paul Williams testified that about two or three hours before the police were shot he, with Vernon Baker, had seen Knights on the 8th or 9th floor of the 1150 building with an unnamed person. Knights gave a .22 rifle to that person, who, in turn, gave it to Williams.

Police officer Northen testified that on March 13, 1971, Earline Maten told him Knights had come to Apartment 207 about five minutes after the shots were fired and said, "Don't worry, everything's all right" or words to that effect. He also testified that she had never told him she had seen Knights at the time of the shooting.

Virgil Cross, assistant maintenance superintendent at Cabrini-Green, testified that Knights and Boizell Wilson were janitor's helpers who had worked together for several months, possibly a year, and that they had access to apartment keys.

George Morganthaler, a clerk at the J. W. Millikan Sporting Goods store in Hammond, Indiana, testified that on July 16, 1970, he sold two boxes of Winchester .30-.30 ammunition to a person who signed the Federal disposition record "G. E. Knights" and that this signature corresponded with the writing on identification presented to him by the purchaser. David J. Purtell, a police department examiner of questioned documents, testified that the name thus signed was signed by defendant Knights. Joseph William Mortimer, a fingerprint technician, testified that the fingerprint found on the ammunition box recovered from the incinerator room was that of defendant Knights.

Nan Harper, a clerk in the Remirmelli Drug Store, testified that on July 8, 1970, Knights left a shell casing and said, "Tell Marv [Marvin Solomon] this is what I have been shooting." Marvin Solomon later gave this shell casing to the police.

Ernest Warner, a firearms examiner, testified that this .30-.30 cartridge had been fired from the Savage rifle found in the incinerator room.

Marvin Solomon also testified that between 6 and 6:15 p.m. on the day of the shooting defendant Knights, standing outside the drugstore, asked Solomon if he had any .30-.30 shells and that when Solomon said he did not, Knights said, "Maybe you would like to buy a .30-.30 Winchester, lever action." Solomon then asked Knights if he had more than one rifle to sell and Knights said he had two rifles and that one was a .30-.30 Stevens

bolt action with a high-powered scope. Solomon told Knights he would let him know if he wanted to purchase any of the rifles. About a month before July 8, 1970, Knights asked Solomon if he had any .30-.30 ammunition. When informed that Solomon had none, Knights said, "I can go to Indiana and get any sized bullet I want" and Solomon told Knights that is what he should do.

In December of 1969, Solomon at Knights' request had given Knights some .22 rifle shells. At that time Knights said that he had a .22 magnum with a scope and that he was real good with it and could hit anything at 600 feet.

Officer Curtis Crisler testified that sometime before July, 1970, Knights had told him that he was going to buy some type of army rifle to go deer hunting and that in June or July of that year he had seen Knights in a window on the south side of the 1150 building on the 8th floor holding something which looked like a rifle, although Officer Crisler was not sure it was, and that Knights had hollered, "I've got it. Hey, Cris, I've got it."

Earline Maten testified for the defense that she heard the shots and saw the police officers fall and that defendant Knights was in the parking lot of the 1150 building at that time. He grabbed her small son and ran into the building and up the steps to Apartment 207. She also testified that she did not tell Officer Smith that she saw defendant Knights in the parking lot at the time of the shooting. She further testified that she did not tell Detective Northen that Knights had come to Apartment 207 about five minutes after the shooting and said, "Everything is all right. Don't worry."

Marsha Jones testified that she saw defendant Knights sitting on a car right in front of the 1150 building after seeing the policemen shot.

George Williams, who had testified for the State, also testified for the defense and stated that on July 17, 1970, at about 3:30 p.m., he had seen Knights sitting in his car in the parking lot northwest of the 1150-1160 building. Williams went to his apartment (405), which faced east into the other parking lot of the 1150 building. Williams went to sleep. He heard a shot and, looking down into the parking lot on the east side of the building, saw Knights standing there and Mrs. Maten standing near the fence. Williams called down to Knights and asked him what was happening. Knights raised two fingers and said two policemen had just been shot. Knights was gathering up some kids. Williams also testified that since he had been asleep he did not know when the police were shot or how long before he woke up they had been shot. Nor did he know if he had been asleep when the police officers were shot. Williams was a friend of the Knights family.

Defendant Knights testified in his own behalf. He stated that he operated a livery service with George Williams and that on July 16, 1970, he drove Boizell Wilson to Hammond, Indiana, for a charge of $10. Wilson

there went into a department store and then came out and asked Knights to buy some bullets for him because he could not buy them himself. Wilson wanted two boxes of .30-.30's and gave Knights $15. Knights bought the shells, signing the registration form. He gave the shells to Wilson and drove back to the 1150 building, parking in front of the breezeway, where George Boone was standing. Boone asked Wilson, "Did you get them?" and Wilson said, "Yes." Both of them went into the 1150 building.

Knights further testified that on July 17, 1970, at about 7 p.m., he was in front of the 1150 building and that there he saw Mrs. Maten and others. He heard the shooting and saw one policeman lying on the ground and the other one fall. Knights then started getting the children into the building. He grabbed some of them and ran into the building. He did not know which child he had carried nor did he know how long he had stayed in Apartment 207.

Defendant Knights denied that on July 8 or any other date had he given Nan Harper a shell casing and said, "Tell Marv this is what I have been shooting." He also denied that on July 17, 1970, he had stood outside the drugstore and asked Marvin Solomon for any .30-.30 bullets or told Solomon he had two rifles, a Winchester and a Savage; that conversation never occurred. Knights further testified that he did not shoot or kill the two police officers on July 17, 1970. He further denied that he had said on July 17, 1970, about 9 or 10 p.m., "I told you I would get two of those white mother fuckers." He testified he did not know Jerry Davis, Jake Davis or Robert Curry and did not say to the latter, "Why [do] the pigs have to umpire baseball games." He never talked to Officer Crisler about getting a gun and did not remember yelling at Crisler out of a window and saying, "I've got it, Chris."

Knights also testified that George Williams had yelled down to him and asked what had happened and that after he had told Williams, he (Knights) started getting the children into the building.

Knights further testified he had never told his attorney that he had bought the .30-.30 shells for someone other than Boizell Wilson or George Boone.

■■ Knights' attorney, in surrebuttal, testified that the petition for severance which he filed on behalf of Knights stated that defendant Knights would claim the purchase of the .30-.30 shells was for Veal and that Veal would claim that they were for Knights. This information came from Boizell Wilson. Wilson testified only to his name.

Defendants rely heavily on the fact that at the hearing on the post-trial motion Jake Davis, Jerry Davis and Paul Williams recanted their testimony. It is well settled that recanting testimony is regarded as very unreliable, especially where the recantation includes a question of

perjury. (*People v. Marquis* (1931), 344 Ill. 261, 176 N.E. 314; *People v. Bickham* (1974), 23 Ill. App. 3d 1074, 320 N.E.2d 478.) The trial court here, after hearing and closely observing the demeanor of the three witnesses at the hearing on the post-trial motion and having heard and observed their demeanor at the trial, specifically found that their recantation testimony at the hearing on the post-trial motion was not credible. We have reviewed the lengthy transcript of both the post-trial proceedings and the trial and conclude that the trial court's appraisal of the recantation is fully sustained by the record.

Although no one testified directly to seeing the defendants shoot the police officers, it was for the jury as the trier of fact to draw inferences from the evidence and to determine the credibility of the witnesses and the weight to be given their testimony. Unless the evidence is so improbable as to raise a reasonable doubt of guilt, we will not reverse a defendant's conviction. *People v. Zuniga* (1973), 53 Ill. 2d 550, 293 N.E.2d 595.

In *People v. Williams* (1977), 66 Ill. 2d 478, 484-85, 363 N.E.2d 801, the supreme court, in answer to the argument that there was no direct evidence that either defendant there perpetrated the acts which caused the deaths, stated:

> "We find apposite here the statement in *People v. Marino*, 44 Ill. 2d 562, 580, that 'it is well settled that the commission of an offense may be established entirely by circumstantial evidence. As we observed in *People v. Bernette*, 30 Ill. 2d 359, 367, "a conviction may be sustained upon circumstantial evidence as well as direct evidence (*People v. Russell*, 17 Ill. 2d 328), it being necessary only that the proof of circumstances must be of a conclusive nature and tendency leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else committed the crime. (*People v. Magnafichi*, 9 Ill. 2d 169; *People v. Grizzel*, 382 Ill. 11.) The jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish guilt, but it is sufficient if all the evidence, taken together, satisfies the jury beyond a reasonable doubt of the accused's guilt." ' Proof of guilt beyond a reasonable doubt does not require proof beyond any possibility of a doubt. (*People v. Hanson*, 59 Ill. 266; *People v. Branion*, 47 Ill. 2d 70.) From our examination of the record we conclude that the evidence is sufficient to prove guilt of both defendants of both murders beyond a reasonable doubt."

■■ Similarly here, from our examination of the record we conclude that the evidence is sufficient to prove each defendant guilty of each murder beyond a reasonable doubt.

█■ Defendants contend that the trial judge erred by conducting an in camera inspection of certain reports and subsequently denying the defense access to those reports. The State argues that the trial judge properly conducted an in camera inspection to determine the relevance of the requested material.

Some of the reports thus examined were reports made by Chicago police officer Durkin. On direct examination, he had testified that on July 21, 1970, he received a .30-.30 cartridge casing from Officer Chowath. Durkin took the casing to Marvin Solomon, who made an identifying mark on the casing in Durkin's presence. Later Durkin inventoried the casing and took it to the police crime laboratory. Durkin identified the casing in court.

The State tendered Durkin's report concerning this testimony to defense counsel. Defense counsel stated that they were entitled to all of Durkin's reports on this case before cross-examining him. The State argued that only relevant material was to be disclosed.

Durkin testified that all of his reports on this case were in the possession of the trial judge. After viewing the reports in chambers, the court ruled that the reports, except for the report tendered to the defendants relating to Durkin's testimony, were irrelevant and therefore need not be produced.

The procedure followed by the trial court was proper under the law as it existed at the time of trial. In *People v. Wolff* (1960), 19 Ill. 2d 318, 327, 167 N.E.2d 197, the court stated:

> "Accordingly, we adopt the view that where no privilege exists, and where the relevancy and competency of a statement or report has been established, the trial judge shall order the document delivered directly to the accused for his inspection and use for impeachment purposes. However, if the prosecution claims that any document ordered to be produced contains matter which does not relate to the testimony of the witness sought to be impeached, the trial judge will inspect the document and may, at his discretion, delete unrelated matters before delivery is made to the accused."

This procedure was followed in *People ex rel. Walker v. Pate* (1973), 53 Ill. 2d 485, 503, 292 N.E.2d 387.

Although the cases on which defendants rely hold that a trial judge cannot, by an in camera inspection, determine whether the requested material is impeaching (*People v. Bassett* (1974), 56 Ill. 2d 285, 307 N.E.2d 359, and *People v. Sumner* (1969), 43 Ill. 2d 228, 252 N.E.2d 534), they, as well as other cases, either directly or impliedly approve the authority of a trial judge to determine the relevancy of the material sought. (*Walker*, at

503; *Wolff*, at 327; *Bassett*, at 291; *Sumner*, at 235.) In *Walker*, the court stated:

> "The third denial of which the defendant complains in this argument concerns certain material prepared by Vernon H. Daluge, a crime technician who had examined the area where the shooting occurred. At the beginning of the cross-examination of Daluge the defendant asked to be furnished with the witness's notes and reports of investigation which he had prepared, and this was allowed by the court. But the People then objected to furnishing the defendant with two documents, which the witness apparently had in his possession, the contents of which are not disclosed by the record. The prosecution protested that they were not relevant to the testimony given by the witness. After examining the two documents the court sustained the objection on the ground that they were irrelevant to the testimony which had been given. There was no error in the trial court's examining the documents and, having concluded that they did not relate to the testimony of the witness, in denying the defendant's request. *People v. Wolff*, 19 Ill. 2d 318, 326-327." 53 Ill. 2d 485, 503.

The trial judge's examinations and rulings with reference to Officer Durkin's reports and with reference to other reports during the course of the trial were proper. The statements of the trial court show that the reports he did not turn over to the defense were found by him to be irrelevant; there is no indication that the court's rulings were based on the impeaching quality of them.

It is interesting to note that one of Officer Durkin's reports ruled irrelevant was a report by him with reference to a statement by Officer Langham. After Officer Langham testified, the State produced Officer Durkin's report because Langham's testimony had made it relevant.

■■ Finally, defendants argue that the court improperly instructed the jury concerning admissions. The court gave IPI Criminal Instruction No. 3.06. This instruction was proper. An admission is a statement by the accused of a fact or facts which, when taken with proof of other facts, may lead to an inference of guilt of the crime charged, but from which guilt does not necessarily follow. (*People v. Kurzydlo* (1974), 23 Ill. App. 3d 791, 320 N.E.2d 80, *appeal denied* (1975), 58 Ill. 2d 594.) Roosevelt Moore testified that Knights had said, "I told you I was going to get two of those white mother fuckers." Jerry Davis testified that Knights said, "I shot the fuck out of those two police." William Dyson testified that Veal said, "See how the Stones do it; let's see if you all can get three of them" and that "we" shot the police officers, and Jake Davis testified that Veal said "we" shot the police. These certainly were statements by the

defendants which, taken with the other evidence in the record, might lead to an inference of guilt of the murders of the two police officers. IPI Criminal No. 3.06 left it to the jury, who had heard this testimony, to determine whether the defendants had made the admissions and, if so, the weight to be given them, considering all of the circumstances under which they were made. The instruction is not subject to the criticism voiced by defendants that it improperly assumes that the statements attributed to the defendants constituted admissions.

The judgments of the circuit court of Cook County are affirmed.

Judgments affirmed.

GOLDBERG, P. J., and McGLOON, J., concur.